STATE OF NORTH CAROLINA v. EDDIE LAMAR TAYLOR

No. 719A05

(Filed 12 December 2008)

**1. Constitutional Law— forensics—not recorded or lost—due process**

The State's failure to secure physical evidence in a first-degree murder prosecution was unintentional and defendant's due process rights were not violated. Although the investigator did not record the location of each piece of evidence within the store where the robbery and murder occurred and the crime scene photographs were lost, the evidence was of only speculative exculpatory value and the trial court did not err by denying defendant's motion to strike the death penalty or to suppress the ballistics evidence.

**2. Jury— selection—race-based peremptory challenge—no prima facie showing**

A first-degree murder defendant did not make a prima facie showing of a race-based peremptory challenge by the State where there was no pattern of discrimination and the prospective juror expressed tremendous hesitation in being able to vote for the death penalty.

**3. Homicide— instructions—second-degree murder as lesser included offense**

The trial court did not err by refusing defendant's request to instruct the jury on second-degree murder as a lesser included offense of first-degree premeditated and deliberate murder where defendant's conduct before, during, and after the murder provides sufficient positive evidence of premeditation and deliberation. Neither the absence of evidence of a plan to commit murder nor evidence that one was not the first to fire in a gunfight negates premeditation and deliberation.

**4. Criminal Law— prosecutor's closing argument—defendant's credibility—prosecutor's personal belief**

The trial court did not err by not intervening ex mero motu in the prosecutor's closing argument in a first-degree murder prosecution when the prosecutor argued that he did not believe defendant's statement. Given the overall context and the brevity

of the remark, it was not "so grossly improper" as to render the proceeding fundamentally unfair.

## 5. Criminal Law— outside contact with juror—mistrial denied

The trial court did not err by denying a first-degree murder defendant's motion for a mistrial based on contact between a juror and an outside party. The trial court questioned all of the parties, reprimanded and warned the person who allegedly followed the juror, specifically questioned the two jurors involved in the incident and received their individual assurances of impartiality, and inquired generally of all jurors and received their assurances of impartiality.

## 6. Robbery— attempted—evidence sufficient

The trial court did not err by denying defendant's motion to dismiss a charge of attempted armed robbery of one victim arising from a robbery and shooting in a store. Defendant's attempted robbery was complete, despite the fact that defendant moved to an easier target without taking money from the first.

## 7. Evidence— flight—instruction appropriate and not prejudicial

The trial court did not err in a first-degree murder prosecution by instructing the jurors that they could consider flight in determining guilt. There was evidence that defendant left the scene hurriedly without aiding the victims and sought to avoid apprehension; moreover, even if the instruction was improper, there was overwhelming evidence of guilt, and the court correctly instructed the jury that proof of flight was not sufficient by itself to show guilt.

## 8. Constitutional Law; Homicide— felony murder—jury unanimity

The requirement of unanimity was satisfied in a felony murder conviction where there was an armed robbery of two store owners and of a patron, but the trial court did not specifically instruct the jurors as to which robbery they should consider as the underlying felony for the purpose of finding felony murder. Either of the alternative acts established an element of felony-murder.

**9. Homicide— felony murder and premeditation—underlying robbery convictions not arrested**

The trial court did not err by failing to arrest armed robbery judgments underlying a felony murder conviction where defendant was convicted on the basis of premeditation and deliberation and felony murder.

**10. Sentencing— capital—aggravating circumstance—pecuniary gain—armed robbery**

There was no plain error in the court's instruction on the pecuniary gain aggravating circumstance in a first-degree murder prosecution in a case which also involved an armed robbery. The court did not remove the requirement that the jury find that the murder was motivated by a hope or expectation of pecuniary gain.

**11. Sentencing— capital—aggravating circumstance—pecuniary gain—prosecutor's argument**

The trial court did not err by failing to intervene ex mero motu during the State's closing argument about the pecuniary gain aggravating circumstance in a first-degree murder prosecution. Although defendant contended that the jurors would have understood the prosecutor's statements to mean that the guilty verdicts on armed robbery and conspiracy to commit robbery automatically required the pecuniary gain aggravating circumstance, the prosecutor distinguished between the State's contention and what the jury must find, and told the jurors that they must look to the trial court for explanation and instruction on the aggravating circumstances.

**12. Constitutional Law— effective assistance of counsel—concession of aggravating circumstance**

A first-degree murder defendant was not denied the effective assistance of counsel where defense counsel briefly conceded the pecuniary gain aggravating circumstance before shifting the discussion to mitigating circumstances, which was consistent with an overall strategy of openness and truthfulness and the abundant evidence that the murder was committed for pecuniary gain.

STATE v. TAYLOR

[362 N.C. 514 (2008)]

**13. Sentencing— capital—mitigating circumstance—no significant criminal activity**

The trial court did not err in a capital sentencing proceeding by not submitting the mitigating circumstance of no significant history of prior criminal activity. Although defendant argues that his witnesses depicted a comprehensive life history without significant criminal activity, finding the circumstance on this evidence alone would be based upon speculation and conjecture. N.C.G.S. § 15A-2000(f)(1).

**14. Sentencing— capital—multiple nonstatutory mitigating circumstances—shorthand instruction—single peremptory instruction**

The trial court did not commit plain error in a capital sentencing proceeding by giving a shorthand instruction for thirty-two nonstatutory mitigating circumstances and by giving a single peremptory instruction for all of those nonstatutory mitigating circumstances.

**15. Sentencing— capital—aggravating circumstance—pecuniary gain—evidence sufficient**

There was sufficient evidence in a capital sentencing proceeding of the aggravating circumstance of pecuniary gain even where defendant did not personally take money from the victim and the trial court did not instruct on acting in concert in this context.

**16. Sentencing— capital—prosecutor's argument—course of conduct—any misstatement cured by court**

The trial court did not err in a capital sentencing proceeding by not intervening ex mero motu during the State's closing argument on the course of conduct aggravating circumstance. The prosecutor distinguished between what the State contended and what the jury must consider and find, and the court cured any misstatement by correctly instructing the jury.

**17. Sentencing— capital—jurors' contact with victim's family—no mistrial**

The trial court did not err during a capital sentencing proceeding by denying defendant's motion for a mistrial where the victim's adult children gestured to two jurors with a flat tire with a can of Fix-A-Flat, but both the jurors and the witnesses left without verbal communication. Any contact was at a distance and was nonverbal, fleeting, and unrelated to the trial.

**18. Sentencing— capital—prosecutor's argument—weighing aggravating and mitigating circumstances**

The trial court did not err during a capital sentencing proceeding by not intervening ex mero motu when the prosecutor's statement about weighing aggravating and mitigating circumstances was inconsistent with the law. The trial court properly instructed the jury, curing any misstatement.

**19. Sentencing— capital—prosecutor's argument—absence of remorse**

The trial court did not err in a capital sentencing proceeding by not intervening ex mero motu where the prosecutor commented on the absence of any evidence showing remorse.

**20. Sentencing— capital—prosecutor's argument—characterization of defense witness**

In a capital sentencing proceeding, the prosecutor's characterization of defendant's mental health expert as a professional witness was not so improper that the court erred by not intervening ex mero motu, and neither was an inaccurate statement about the witness's payment.

**21. Criminal Law— recross-examination—records used by mental health expert**

Any error by the court in sustaining the State's objection to defendant's recross-examination of his mental health expert concerning alteration of the records was not prejudicial. The prosecutor did not accuse the witness of falsifying records on cross-examination and did not open the door to defense counsel's question.

**22. Sentencing— capital—prosecutor's argument—life in prison—beyond the record**

The trial court did not err by not intervening ex mero motu in a capital sentencing proceeding where the prosecutor argued beyond the record about various prison amenities defendant would enjoy if sentenced to life in prison.

**23. Sentencing— capital—peremptory instructions not requested—not given**

The trial court did not err in a capital sentencing proceeding by not giving peremptory instructions on three statutory mitigating circumstances which were not requested.

STATE v. TAYLOR

[362 N.C. 514 (2008)]

**24. Sentencing— capital—defense argument—types of murder and death penalty**

The trial court did not abuse its discretion in a capital sentencing proceeding by sustaining the State's objections to a defense argument about the kinds of murders for which the death penalty is appropriate. The court did not sustain objections to all of the comparisons, and defendant was not prohibited from arguing that the circumstances of his case did not warrant the imposition of the death penalty.

**25. Sentencing— capital—death sentence—supported by evidence—not arbitrary**

The record fully supported the aggravating circumstances found by the jury in a capital sentencing proceeding, and there was no evidence that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

**26. Sentencing— capital—proportionate**

A sentence of death was not disproportionate where defendant was convicted on the basis of both premeditation and deliberation and the felony murder rule, the jury found that the murder was part of a course of conduct that included other violent crimes and was committed for pecuniary gain, there was no evidence that defendant demonstrated remorse for the murder, and the case is more similar to cases in which the death sentence was held proportionate.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Jack A. Thompson on 24 August 2005 in Superior Court, Harnett County, upon a jury verdict finding defendant guilty of first-degree murder. On 26 February 2007, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 12 February 2008.

*Roy Cooper, Attorney General, by William B. Crumpler and Daniel P. O'Brien, Assistant Attorneys General, for the state.*

*Staples Hughes, Appellate Defender, by Anne M. Gomez and Daniel K. Shatz, Assistant Appellate Defenders, for defendant-appellant.*

**STATE v. TAYLOR**

[362 N.C. 514 (2008)]

MARTIN, Justice.

On 12 January 2004, Eddie Lamar Taylor (defendant) was indicted for the murder of Talmadge "Mitch" Joseph Faciane, Jr. (Mr. Faciane or the victim). Defendant was also indicted for two counts of robbery with a dangerous weapon, one count of conspiracy to commit robbery with a dangerous weapon, one count of attempted robbery with a dangerous weapon, and three counts of first-degree kidnapping. Defendant was tried capitally at the 25 July 2005 session of Superior Court, Harnett County.

On 17 August 2005, a unanimous jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, and under the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment accordingly. Defendant gave notice of appeal pursuant to N.C.G.S. § 7A-27(a).

The evidence admitted during the guilt-innocence phase of defendant's trial tended to show the following: Mr. Faciane and his wife Dawn (Mrs. Faciane) owned and operated a community store known as Mitch's Grocery in Bunnlevel, North Carolina. The store contained food and various supplies, along with pinball machines, arcade games, and video poker machines. The video poker machines dispensed tickets, which customers could exchange for cash at the check-out counter. An envelope under the register held cash designated for video poker activities.

The check-out counter and cash register were located at the front of the store. At the back of the store were two steps, which led around a corner to the area containing the video poker machines. Surveillance cameras monitored both the front counter area and the video poker area. A door to the side of the check-out counter led to a garage where employees performed tire changes and other automotive repairs. This door also led to a side room that the Facianes used for storage and for sleeping on nights they did not want to drive home after closing.

At approximately 9:00 p.m. on 4 December 2003, the Facianes were working at their store when two customers, Barry and Sandra Butts (Mr. and Mrs. Butts or the Buttses), arrived and began playing the video poker machines. Shortly thereafter, Mr. Faciane went into the side room to take a shower while Mrs. Faciane remained at the front counter.

**STATE v. TAYLOR**

[362 N.C. 514 (2008)]

Minutes later, defendant and Tyrone Crawley (Crawley) entered the store wearing masks, gloves, and hooded sweatshirts and carrying guns. Defendant rounded the corner to the back where the Buttses were sitting, while Crawley moved towards Mrs. Faciane at the front. Crawley came around the front counter, pointed his gun at Mrs. Faciane, and said, "Give me the money." In response, Mrs. Faciane opened the cash register, and Crawley grabbed a handful of twenty dollar bills and receipts and put them in his pocket. Crawley began to reach for the ten dollar bills, but then stated, "No, I want 'the' money." Mrs. Faciane, assuming he was referring to the envelope containing cash for the games, retrieved the envelope from a shelf below the register and handed it to him.

In the meantime, defendant walked up behind the Buttses, pointed a gun at them, and ordered them to "stay still." The Buttses raised their arms in the air. Defendant then asked if they had anything in their pockets. Mr. Butts, who could not reach into his pockets, asked if he should stand, to which defendant responded, "No." Defendant then moved behind Mrs. Butts, leaned over her with his gun behind her neck, and removed her billfold from her jacket pocket. Defendant began looking through the billfold, which contained a check card, checkbook, and loose change.

Meanwhile, in the front of the store, Mr. Faciane appeared in the side doorway holding a twelve-gauge shotgun and said, "No." The next moment, Mrs. Faciane heard a loud noise. Mr. Faciane fell forward, no longer holding his gun. Mr. Faciane and Crawley then began struggling with each other on the floor, apparently wrestling over their guns. Mrs. Faciane grabbed her own revolver from a shelf behind the counter and fired twice at Crawley, attempting to hit his back or shoulder. In response to the gunfire in the front of the store, defendant stepped around the corner, saw Crawley and Mr. Faciane wrestling on the floor, and began firing at Mr. Faciane.

Mrs. Faciane testified that around this time, "it seemed like a war broke loose" and "gunshots seemed to be coming from everywhere." Bullets were flying past her from the back of the store. Mrs. Faciane saw Mr. Faciane, who had been attempting to stand up by bracing himself at the counter, fall to the ground. As Mrs. Faciane reached down to help Mr. Faciane, Crawley pumped the shotgun and fired at her, shooting her in the arm. He then ran towards the exit, but turned and paused, at which point Mrs. Faciane, afraid he was going to shoot her again, fired at him until she ran out of bullets. Mr. Faciane, who had since picked up Crawley's weapon, also fired at

Crawley from his position on the floor. Defendant ran back in the direction of the Buttses, circled around some shelves, and left the store.

After defendant and Crawley left, Mr. Faciane told Mrs. Faciane to call 911 because he had been shot. Mrs. Faciane attempted to place Mr. Faciane flat on the floor in order to determine where he had been shot and report his condition to the 911 operator. By the time emergency personnel arrived, however, Mr. Faciane was unconscious and breathing abnormally. Mr. Faciane bled to death on the floor of his store.

The Buttses left the store immediately after the robbery because Mrs. Butts was hyperventilating, and they went to the Harnett County Sheriff's Office, where they each gave a statement. Too afraid to sleep in their own home, they spent the night with their adult daughter.

An autopsy revealed that Mr. Faciane was shot two times and died as a result of blood loss from the wounds. One bullet entered Mr. Faciane's chest, causing bleeding in his chest cavity, and exited through his back shoulder blade. Another bullet entered his abdomen, causing bleeding there, and exited through his buttock. This second bullet lodged in Mr. Faciane's underwear and was discovered by the medical examiner who performed the autopsy. Lab testing and forensic investigation revealed that this bullet came from defendant's gun.

Emergency personnel and law enforcement officers arrived at the scene within minutes following the shootings. They described the store as a chaotic "war zone." Bullet casings, spent projectiles, debris, and shattered glass from doors and windows were everywhere. Later investigation showed that approximately thirty shots had been fired during the incident, with at least seven of those bullets coming from defendant's gun.

When defendant left Mitch's Grocery, he drove Crawley to Cape Fear Valley Hospital in Fayetteville. Defendant told the hospital security guard that Crawley had been shot in Fayetteville. The security guard escorted defendant to a deputy's office. Meanwhile, officers from the Harnett County Sheriff's Department who were at Mitch's Grocery were alerted to the presence of a possible suspect at Cape Fear Valley Hospital, and they requested that the deputy keep an eye on defendant until they arrived.

**STATE v. TAYLOR**

[362 N.C. 514 (2008)]

Crawley died as a result of a single gunshot wound to the chest. Hospital personnel discovered an identification card, one hundred three dollars, and receipts from Mitch's Grocery on Crawley's person.

When law enforcement officers arrived at the hospital, they took defendant to a hospital examination room and administered *Miranda* warnings. Defendant agreed to give a statement, in which he related that he had remained in the car while Crawley and a third person, whom he described as "B," robbed Mitch's Grocery. The officers then placed defendant under arrest for robbery with a dangerous weapon.

Defendant subsequently left the hospital with the officers and directed them to an abandoned house near Mitch's Grocery, where he claimed his accomplices and he had parked earlier that evening. The officers searched a path from the abandoned house to Mitch's Grocery and discovered Mrs. Butts's billfold on the ground. The officers then took defendant to the sheriff's department.

At the sheriff's department, defendant gave a second statement in which he again said he had stayed in the car during the robbery of Mitch's Grocery. This interview was cut short, however, by an officer who had been viewing the surveillance tape from the store. The tape showed defendant coming up behind the Buttses and the Buttses raising their hands. It next showed defendant stepping away from the Buttses, pointing a gun towards the front of the store, lowering the gun, and raising it up again while bringing his left hand to it.

Defendant agreed to give a third statement. He was shown a photograph from the video surveillance tape at some point before or during this third interview. During the interview, defendant related that before the robbery, he and Crawley rode around smoking marijuana. Crawley had a gun in the back seat, which looked like a machine gun. Around 8:45 p.m., the two picked up "B." "B" had a diagram of Mitch's Grocery that described in detail the store's layout. "B" told defendant and Crawley that a garage was attached to the store and that the store owners lived in a room next to the garage. "B" also said the store was a "gambling joint" where he had seen people win $1600 and $2500. "B" stated that the money was kept in a specific location behind the counter. The three proceeded to Mitch's Grocery and parked behind an abandoned house near the store. "B" pulled out a handgun, and defendant asked "B" for it.

In his statement, defendant admitted he entered the store, approached the Buttses, and took Mrs. Butts's billfold from her pocket. He also confessed to firing "B" 's gun, claiming that, upon

hearing gunshots in front, he shot three times in the direction of Crawley and the victim without aiming because he did not want to hit his friend.

Defendant offered no evidence in the guilt-innocence phase of trial. At the close of the state's evidence, the trial court allowed defendant's motion to dismiss the three kidnapping charges for insufficient evidence. In addition to finding defendant guilty of first-degree murder, the jury also found him guilty of robbery with a dangerous weapon and conspiracy to commit robbery with a dangerous weapon of the Facianes, robbery with a dangerous weapon of Mrs. Butts, and attempted robbery with a dangerous weapon of Mr. Butts.

Additional facts and descriptions of events at trial, as necessary to an understanding of defendant's arguments, are set forth below.

## PRETRIAL ISSUES

[1] Defendant argues the trial court erred by denying his motion to strike the death penalty as a possible sentence, or alternatively, to suppress all ballistics evidence collected at the crime scene because the state failed to preserve certain evidence.

Shortly after the murder, the Harnett County Sheriff's Department dispatched an investigator to Mitch's Grocery to process the crime scene. The investigator took approximately two hundred photographs to document the location of various pieces of evidence. He also collected shell casings, spent projectiles, and other evidence, but did not record in writing the specific location within the store where each item was discovered. The crime scene photographs were subsequently lost and unavailable for trial.

Before trial, defendant moved to strike the death penalty or to suppress all ballistics evidence recovered at the crime scene on the ground that the state failed to preserve evidence potentially exculpatory with respect to his defense. Following a hearing, the trial court denied both motions, noting in part that: (1) "There was no evidence presented that any procedures not followed by law enforcement in securing physical evidence was intentional on the part of law enforcement . . . ."; and (2) "There also is no showing by the Defendant that any errors committed by law enforcement in gathering evidence resulted in any prejudice to the defendant."

Defendant argues on appeal that he is entitled to a new sentencing proceeding because the state's failure to properly process the

crime scene deprived him of evidence allegedly favorable with respect to his defense. In support of this argument, defendant proposes the following logical sequence: (1) proper documentation of the evidence would have revealed that no shell casings or projectiles were discovered in the back of the store where the video poker machines were located; (2) this evidence would have refuted testimony by Mrs. Faciane suggesting that the first shot was fired from the back of the store; (3) this in turn would have proved defendant did not fire his weapon until after shots erupted in the front of the store; (4) this information ultimately would have resulted in more jurors finding the nonstatutory mitigating circumstance that defendant "fired only after others fired shots"; and (5) the jury would have returned a different verdict at sentencing. Defendant's argument lacks merit.

Whether a failure to make evidence available to a defendant violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution depends in part on the nature of the evidence at issue. See Arizona v. Youngblood, 488 U.S. 51, 57 (1988). When the evidence is exculpatory, that is, "either material to the guilt of the defendant or relevant to the punishment to be imposed," the state's failure to disclose the evidence violates the defendant's constitutional rights irrespective of the good or bad faith of the state. California v. Trombetta, 467 U.S. 479, 485 (1984) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). Nonetheless, when the evidence is only " 'potentially useful' " or when " 'no more can be said [of the evidence] than that it could have been subjected to tests, the results of which might have exonerated the defendant,' " the state's failure to preserve the evidence does not violate the defendant's constitutional rights unless the defendant shows bad faith on the part of the state. State v. Mlo, 335 N.C. 353, 373, 440 S.E.2d 98, 108 (quoting Youngblood, 488 U.S. at 57-58), cert. denied, 512 U.S. 1224 (1994); accord State v. Hunt, 345 N.C. 720, 725, 483 S.E.2d 417, 420-21 (1997); State v. Drdak, 330 N.C. 587, 593-94, 411 S.E.2d 604, 608 (1992). The United States Supreme Court has noted the difficulties involved in requiring a state "to take affirmative steps to preserve evidence on behalf of criminal defendants," Trombetta, 467 U.S. at 486, and has stated that "police do not have a constitutional duty to perform any particular tests" on crime scene evidence or to "use a particular investigatory tool," Youngblood, 488 U.S. at 58-59 (stating also that the Due Process Clause does not "impose[] on the police an

undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution").

In *Arizona v. Youngblood*, the United States Supreme Court concluded that the state's good faith failure to properly preserve semen samples from the body and clothing of a sexual assault victim did not violate the defendant's constitutional rights, even though the defendant argued the victim had erred in identifying him as the perpetrator and even though testing of the samples may have exonerated the defendant. 488 U.S. at 53-54, 56-58. The Court explained that "[t]he failure of the police to [preserve] the clothing and to perform tests on the semen samples can at worst be described as negligent" and "there was no suggestion of bad faith on the part of the police." *Id.* at 58.

Similarly, in *State v. Hunt*, this Court held the state's failure to preserve items seized at the defendant's home on the day of his arrest did not violate his due process rights, even though he argued the evidence would have shown he was intoxicated at the time of the murder. 345 N.C. at 724-25, 483 S.E.2d at 420-21. In so holding, we observed that "the exculpatory or impeachment value of the missing evidence [was] speculative" and "[n]othing in the record suggest[ed] that any law enforcement officer willfully destroyed the missing evidence." *Id.* at 725, 483 S.E.2d at 420.

In the present case, the state failed to preserve evidence with only speculative exculpatory value. Even had the evidence tended to show that defendant did not initiate the melee, this information was already before the jury from several sources. The testimony of both Mr. and Mrs. Butts, as well as defendant's own statement to law enforcement, indicated defendant did not fire from the video poker area of the store. In fact, one or more jurors found the nonstatutory mitigating circumstance that defendant "fired only after others fired shots."

Furthermore, the record supports the trial court's finding that any failure by law enforcement to follow procedures in securing physical evidence was unintentional. Because the state's failure to preserve potentially useful evidence from the crime scene "can at worst be described as negligent" and "there was no suggestion of bad faith," defendant's due process rights were not violated. *See Youngblood*, 488 U.S. at 58. Accordingly, the trial court properly denied defendant's motions to strike the death penalty and to suppress ballistics evidence.

STATE v. TAYLOR

[362 N.C. 514 (2008)]

## JURY SELECTION

[2] Defendant next argues the trial court erred by holding that he failed to make a prima facie showing of racial discrimination when he objected to the state's peremptory challenge to an African-American prospective juror.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution prohibit race-based peremptory challenges during jury selection. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *State v. Nicholson*, 355 N.C. 1, 21, 558 S.E.2d 109, 124, *cert. denied*, 537 U.S. 845 (2002). In *Batson v. Kentucky*, the United States Supreme Court set out a three-part test for determining whether the state impermissibly excluded a juror on the basis of race, 476 U.S. at 96-98, and this Court subsequently adopted that same test, *see State v. Augustine*, 359 N.C. 709, 715, 616 S.E.2d 515, ·521 (2005) (citing *State v. Barden*, 356 N.C. 316, 342, 572 S.E.2d 108, 126 (2002), *cert. denied*, 538 U.S. 1040 (2003)), *cert. denied*, 548 U.S. 925 (2006). First, the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge. *Augustine,* ·359 N.C. at 715, 616 S.E.2d at 522 (citing *Batson*, 476 U.S. at 96-97). If the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge. *Id.* (citing *Batson*, 476 U.S. at 97-98). Finally, the trial court must decide whether the defendant has proved purposeful discrimination. *Id.* (citing *Batson*, 476 U.S. at 98); *see also Snyder v. Louisiana*, —— U.S. ——, ——, 128 S. Ct. 1203, 1211-12 (2008) (holding that prosecutor's proffered reason for peremptory challenge of African-American prospective juror was a pretext for purposeful discrimination when prosecutor accepted white jurors with "shared characteristic" of expressed concern regarding serving on jury due to conflicting obligations); *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.").

In the present case, the trial court determined that defendant failed to make a prima facie showing. In reviewing this determination, we are mindful that trial courts, given their experience in supervising *voir dire* and their ability to observe the prosecutor's questions and demeanor firsthand, are "well qualified to 'decide if the circumstances concerning the prosecutor's use of peremptory chal-

lenges creates a prima facie case of discrimination.' " *State v. Chapman*, 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005) (alteration omitted) (quoting *Batson*, 476 U.S. at 97). The trial court's findings will be upheld on appeal unless they are clearly erroneous—that is, unless " 'on the entire evidence [we are] left with the definite and firm conviction that a mistake ha[s] been committed.' " *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 369 (1991)).

Several factors are relevant to whether a defendant has made a prima facie showing of racial discrimination: the races of the defendant, the victim, and key witnesses; the prosecutor's statements or questions to African-American prospective jurors that either appear racially motivated or alternatively, tend to refute an inference of discrimination; the prosecutor's repeated use of peremptory challenges against African-Americans in a manner that tends to establish a pattern of challenges against African-Americans in the venire; and the prosecutor's use of a disproportionate number of peremptory challenges against African-Americans in a single case. *See, e.g., Augustine*, 359 N.C. at 715-16, 616 S.E.2d at 522; *Barden*, 356 N.C. at 343, 572 S.E.2d at 127; *State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995) (citing *State v. Ross*, 338 N.C. 280, 285, 449 S.E.2d 556, 561 (1994)). Additionally, the state's acceptance rate of African-American jurors is a factor that may tend to refute a showing of discrimination. *See, e.g., State v. Fletcher*, 348 N.C. 292, 318, 320, 500 S.E.2d 668, 683-84 (1998), *cert. denied*, 525 U.S. 1180 (1999); *Quick*, 341 N.C. at 145-46, 462 S.E.2d at 189.

With this legal framework in mind, we observe the following with regard to the present case: Defendant is African-American, while the victim was white. Mrs. Faciane and the Buttses were also white. Janet Monroe, an African-American, was the sixtieth prospective juror and was called for consideration as the tenth juror to be seated. Prior to Ms. Monroe's being called for consideration, the state had peremptorily challenged two African-American prospective jurors and had accepted two African-American prospective jurors. The state had peremptorily challenged seven white prospective jurors. After the state utilized its tenth peremptory challenge to excuse Ms. Monroe, defendant asserted a *Batson* violation.

In denying the motion, the trial court first noted that Ms. Monroe "expressed tremendous hesitation in being able to vote for the death penalty" and on that basis "the State was entirely justified in excusing her." The trial court also reviewed the other African-American prospective jurors whom the state peremptorily challenged and de-

**STATE v. TAYLOR**

[362 N.C. 514 (2008)]

termined there was no "pattern of discrimination in the exercised peremptory challenges." The trial court thus concluded defendant had failed to make a prima facie showing that the state peremptorily challenged Ms. Monroe on the basis of her race. Ultimately, two African-American and ten white jurors were chosen to serve, and two African-American jurors and one white juror were selected as alternates.

After careful review of the record, we conclude the trial court properly held that defendant failed to make a prima facie showing of racial discrimination. The state's peremptory challenges to three African-American prospective jurors do not establish a pattern of discrimination when viewed in conjunction with other relevant facts of this case. When defendant made his *Batson* objection, the state had accepted two out of five, or forty percent, of eligible African-American jurors. This Court has previously cited similar acceptance rates as tending to refute an allegation of discrimination. *See, e.g., Fletcher,* 348 N.C. at 320, 500 S.E.2d at 684 (holding defendant failed to establish a prima facie case when the state peremptorily challenged three of five eligible minorities, for an acceptance rate of forty percent); *State v. Abbott,* 320 N.C. 475, 480-82, 358 S.E.2d 365, 369-70 (1987) (same); *see also State v. Gregory,* 340 N.C. 365, 397-99, 459 S.E.2d 638, 656-57 (1995) (concluding defendant failed to make a prima facie showing when minority acceptance rate was 37.5%), *cert. denied,* 517 U.S. 1108 (1996); *State v. Smith,* 328 N.C. 99, 121, 400 S.E.2d 712, 724-25 (1991) (stating that minority acceptance rate of 42.8% "is some evidence that there was no discriminatory intent").

Perhaps more importantly, the evidence of record supports the trial court's finding that Ms. Monroe "expressed tremendous hesitation in being able to vote for the death penalty." Early in the *voir dire* process, Ms. Monroe stated, "Well, you know, the death penalty—we don't have a life to give. I mean, God gave us our life, and we really don't have a life to take." Later she said, "The death penalty, I tell you, I really don't agree with." Ms. Monroe made other similar statements throughout the course of the examination. *See Nicholson,* 355 N.C. at 23, 558 S.E.2d at 126 ("The responses of . . . prospective jurors, even if insufficient to support a challenge for cause, are relevant to a determination of whether defendant has made a prima facie showing." (citations omitted)). Our review of the record reveals that the prosecutor's statements and questions during *voir dire* appear evenhanded and not racially motivated. *See Augustine,* 359 N.C. at 715-16, 616 S.E.2d at 522. That defendant is African-American and the murder

victim was white does not, standing alone, establish a prima facie case of discrimination. *See Quick*, 341 N.C. at 146, 462 S.E.2d at 189 (noting, in holding the defendant failed to make a prima facie showing, that "[t]he only circumstance arguably tending to establish discriminatory intent . . . is the fact that the victims were white and the defendant was black").

Accordingly, the trial court properly determined that defendant failed to establish a prima facie case during his *Batson* challenge.

## GUILT-INNOCENCE PHASE

**[3]** Defendant asserts that the trial court erred by refusing his request to instruct the jury on second-degree murder as a lesser included offense of first-degree premeditated and deliberate murder.

When, as here, the state proceeds against a defendant on theories of both premeditated and deliberate murder and felony murder, the trial court "must instruct on all lesser-included offenses within premeditated and deliberate murder supported by the evidence," "irrespective of whether all the evidence would support felony murder." *State v. Millsaps*, 356 N.C. 556, 565-66, 572 S.E.2d 767, 773-74 (2002).

"An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater." *Id.* at 561, 572 S.E.2d at 771. The trial court should refrain from "indiscriminately or automatically" instructing on lesser included offenses. *State v. Strickland*, 307 N.C. 274, 286, 298 S.E.2d 645, 654 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). Such restraint ensures that " '[t]he jury's discretion.is . . . channelled so that it may convict a defendant of [only those] crime[s] fairly supported by the evidence.' " *State v. Leazer*, 353 N.C. 234, 237, 539 S.E.2d 922, 924 (2000) (quoting *Hopper v. Evans*, 456 U.S. 605, 611 (1982)).

The standard for determining whether the trial court must instruct on second-degree murder as a lesser included offense of first-degree murder is as follows:

If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should prop-

erly exclude from jury consideration the possibility of a convic-
tion of second degree murder.

*Millsaps*, 356 N.C. at 560, 572 S.E.2d at 771 (quoting *Strickland*, 307
N.C. at 293, 298 S.E.2d at 658). Stated differently, the trial court must
determine "whether the State's evidence is positive as to each ele-
ment of [first-degree murder] and whether there is any conflicting
evidence relating to any of these elements." *State v. Leroux*, 326 N.C.
368, 378, 390 S.E.2d 314, 322, *cert. denied*, 498 U.S. 871 (1990).

"Premeditation means that the act was thought over beforehand
for some length of time, however short. Deliberation means an intent
to kill, carried out in a cool state of blood, . . . and not under the influ-
ence of a violent passion or a sufficient legal provocation." *Leazer*,
353 N.C. at 238, 539 S.E.2d at 925 (citations and internal quotation
marks omitted). Because premeditation and deliberation are ordinar-
ily not susceptible to proof by direct evidence, they are most often
proved by circumstantial evidence. *Id.*

This Court has identified certain conduct on the part of a de-
fendant before, during, and after a murder that supports an inference
of premeditation and deliberation. *See, e.g., id.* Such conduct
includes the following: (1) entering the site of the murder with a
weapon, which indicates the defendant anticipated a confrontation
and was prepared to use deadly force to resolve it, *Leazer*, 353 N.C.
at 239, 539 S.E.2d at 925; *State v. Larry*, 345 N.C. 497, 513-14, 481
S.E.2d 907, 916-17, *cert. denied*, 522 U.S. 917 (1997); (2) firing multi-
ple shots, because "some amount of time, however brief, for thought
and deliberation must elapse between each pull of the trigger," *State
v. Austin*, 320 N.C. 276, 295, 357 S.E.2d 641, 653, *cert. denied*, 484
U.S. 916 (1987); *accord State v. Chapman*, 359 N.C. 328, 376, 611
S.E.2d 794, 828 (2005); (3) pausing between shots, *State v. Ball*, 324
N.C. 233, 236, 377 S.E.2d 70, 72 (1989); and (4) attempting to cover up
involvement in the crime, *Chapman*, 359 N.C. at 376, 611 S.E.2d at
828-29; *State v. Trull*, 349 N.C. 428, 448, 450, 509 S.E.2d 178, 191-92
(1998), *cert. denied*, 528 U.S. 835 (1999).

Here, before the murder, defendant entered Mitch's Grocery
armed with a semiautomatic weapon and joined by an accomplice
carrying what defendant described as a machine gun. That defendant
was prepared to fire his weapon in the event of a confrontation,
which the jury could reasonably infer from his bringing the gun into
the store, is evidence of premeditation and deliberation. *See Leazer*,
353 N.C. at 239, 539 S.E.2d at 925; *Larry*, 345 N.C. at 514, 481 S.E.2d

at 916-17. Once inside the store, defendant pointed his gun at two customers in the back and instructed them to stay still and empty their pockets. When shots were fired in the front, defendant stepped around the corner from the back of the store into the front area. He then fired repeatedly towards the front of the store, hitting the victim and killing him. Defendant fired at least seven times with a semiautomatic weapon, a process that required a separate trigger pull for each shot. The store's surveillance camera recorded him pausing at one point, lowering his gun, and then raising it again. Defendant's actions of stepping around the corner to the front of the store, pulling the trigger of his gun seven times, and pausing at some point to lower his gun and raise it again provide ample evidence of premeditation and deliberation. *See Chapman*, 359 N.C. at 376, 611 S.E.2d at 828; *Ball*, 324 N.C. at 236, 377 S.E.2d at 72; *Austin*, 320 N.C. at 295, 357 S.E.2d at 653.

Following the murder, defendant misrepresented the nature of his involvement in the crimes. He misled hospital staff regarding where the shooting occurred and initially told investigators that he remained in the car during the shooting. These attempts to cover up his participation in the murder also support a finding of premeditation and deliberation. *See Chapman*, 359 N.C. at 376, 611 S.E.2d at 828-29; *Trull*, 349 N.C. at 448, 509 S.E.2d at 191-92.

In sum, defendant's conduct before, during, and after the murder provides sufficient positive evidence of premeditation and deliberation. Defendant argues that, although the state produced sufficient evidence of premeditation and deliberation, he was nevertheless entitled to an instruction on second-degree murder because he allegedly lacked a plan to kill the victim and only fired his weapon after gunfire erupted in the front of the store. Neither absence of evidence of a plan to commit murder nor existence of evidence that one was not the first to fire in a gunfight negates premeditation and deliberation. " '[N]o particular amount of time is necessary to illustrate that there was premeditation.' " *State v. Frye*, 341 N.C. 470, 500, 461 S.E.2d 664, 679 (1995) (quoting *State v. Sierra*, 335 N.C. 753, 758, 440 S.E.2d 791, 794 (1994)), *cert. denied*, 517 U.S. 1123 (1996). Moreover, a defendant who initiates a situation without the requisite intent to kill may form such intent in the midst of the situation. *See, e.g., Larry*, 345 N.C. at 513, 481 S.E.2d at 916 (rejecting the contention that, in order to warrant an instruction on premeditation and deliberation, "the evidence must support a finding that [defendant] deliberated the specific intent to kill before the struggle with the victim began"); *State v.*

*Harden*, 344 N.C. 542, 555, 476 S.E.2d 658, 664 (1996) (stating that "[d]eliberation may occur during a scuffle or a quarrel between the defendant and the victim" (citing *State v. Hill*, 311 N.C. 465, 470, 319 S.E.2d 163, 167 (1984))), *cert. denied*, 520 U.S. 1147 (1997). This Court rejected a claim similar to that of defendant in *State v. Frye*, stating that "Defendant's assertion that he had the intent only to rob when he arrived at the victim's house does not negate or contradict the State's proof of premeditation and deliberation" and that "evidence of a struggle during the commission of a felony does not necessarily entitle a defendant to an instruction on a lesser charge." 341 N.C. at 501, 461 S.E.2d at 680.

Furthermore, with respect to evidence tending to show that defendant was not the first to fire, "[a] defendant is not entitled to an instruction on a lesser included offense merely because the jury could possibly believe some of the State's evidence but not all of it." *State v. Annadale*, 329 N.C. 557, 568, 406 S.E.2d 837, 844 (1991). For example, in *State v. Larry*, this Court held that although evidence regarding the number of shots fired by the defendant was conflicting (some witnesses testified the defendant fired one shot, while others testified he fired multiple shots), there was other sufficient positive evidence of premeditation and deliberation such that the trial court was not required to submit lesser included offenses of first-degree murder. 345 N.C. at 514, 518, 481 S.E.2d at 917, 919.

Similarly, in the present case, regardless of whether defendant was the first to fire his weapon, the state presented uncontroverted evidence from which the jury could rationally infer that defendant formed the requisite intent for first-degree murder at some point during the period in which he heard shots erupt in the front of the store, stepped around the corner to observe the action, and fired his weapon multiple times. *See Chapman*, 359 N.C. at 376, 611 S.E.2d at 828; *Leazer*, 353 N.C. at 239, 539 S.E.2d at 925-26.

Defendant also contends his statement, as recorded by law enforcement following the crime, that he "shot three times in the direction of Tyrone [Crawley] and the [victim] without aiming because he did not want to hit his friend" entitles him to an instruction on second-degree murder.

To the contrary, defendant's admission that he fired three times in the victim's direction supports a finding of premeditation and deliberation because "[p]remeditation and deliberation may be inferred from the multiple shots fired by defendant." *See Chapman*, 359 N.C.

at 376, 611 S.E.2d at 828; *see also Larry*, 345 N.C. at 514, 481 S.E.2d at 917 (holding evidence that the defendant fired two or more shots with a pause in between supported a finding of premeditation and deliberation); *State v. Watson*, 338 N.C. 168, 179, 449 S.E.2d 694, 701 (1994) (stating that " 'some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger' " (quoting *Austin*, 320 N.C. at 295, 357 S.E.2d at 653)), *cert. denied*, 514 U.S. 1071 (1995), *overruled in part on other grounds by State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995); *State v. Ruof*, 296 N.C. 623, 637, 252 S.E.2d 720, 729 (1979) (listing " 'the number of shots fired' " as being among "the circumstances to be considered in determining whether a killing is done with premeditation and deliberation" (quoting *State v. Smith*, 290 N.C. 148, 164, 226 S.E.2d 10, 20, *cert. denied*, 429 U.S. 932 (1976))).

Moreover, we will not invent from defendant's obscure assertion that he fired in a specific direction without aiming a scenario in which he shot the victim without the intent to kill. In the past, this Court has refused to consider similarly vague and isolated statements as evidence negating premeditation and deliberation. For example, in *State v. Chapman*, the defendant, while riding in a car, fired several shots into another car, killing one of the passengers. 359 N.C. at 337-38, 611 S.E.2d at 804-05. The defendant argued that his statement just before the murder that he was " 'about to shoot up this car,' " *id.* at 337, 611 S.E.2d at 805, suggested he did not intend to kill a human being and entitled him to an instruction on second-degree murder, *id.* at 377-78, 611 S.E.2d at 829. This Court disagreed and stated that when the defendant fired multiple shots into the victim's occupied vehicle, "Defendant's statement that he was going to shoot 'the car' and the fact that these shots were fired at night and between two moving vehicles in no way negate[d] the State's evidence of *mens rea*." *Id.* at 378, 611 S.E.2d at 829.

Similarly, in *State v. Smith*, 347 N.C. 453, 496 S.E.2d 357, *cert. denied*, 525 U.S. 845 (1998), the defendant was not entitled to an instruction on second-degree murder when the state produced evidence that he set fire to an apartment building to destroy evidence of his earlier mail theft from residents. *Id.* at 463-64, 496 S.E.2d at 363. This Court held that the defendant's "self-serving statement that he set the fire as a prank," made shortly after the crime, "was not sufficient to support an instruction on second-degree murder." *Id.* at 464, 496 S.E.2d at 363; *see also State v. Arnold*, 329 N.C. 128, 136, 139, 404 S.E.2d 822, 827, 829 (1991) (holding that the state presented

sufficient evidence of premeditation and deliberation and an instruction on second-degree murder was not warranted despite the alleged murder's purported statement to a friend following the killing "that he and [the victim] had gotten into a fight and he wished it had not happened," when no evidence suggested the murder occurred during a fight).

Defendant finally argues that Mr. Butts's testimony that defendant's "only objective was to get out of the store" tends to show defendant did not premeditate and deliberate the murder. But defendant has taken Mr. Butts's statement out of context. At trial, Mr. Butts described how defendant approached Mrs. Butts and him and took Mrs. Butts's billfold. Mr. Butts then continued:

Then, there were shots that were fired in the front of the store, and whenever the shots were fired in the front of the store, the [defendant] went to the front of the store. More shots were fired. Then the [defendant] came towards the back of the store and then went around the counters and out towards the front door.

. . . .

Q. When the [defendant] came back, could you see what he was doing?

A. There again, he was—he came back probably a lot faster than he went, I think because shots were being fired again, as I said. And it seemed to me that at that time his only objective was to get out of the store.

Thus, according to Mr. Butts, defendant decided to "get out of the store" after he moved to the front of the store and after much of the gunfight had already occurred. Furthermore, defendant himself told investigators that he first heard gunshots in the front of the store, then fired his weapon several times, and then ran out the door. Combined, these statements indicate it was only after defendant fired multiple shots in the front of the store that he ran back towards the Buttses and appeared to Mr. Butts to be focused on leaving the store. Neither Mr. Butts's testimony nor defendant's leaving the store after shooting the victim negates premeditation and deliberation.

[4] Defendant next contends the trial court erred by failing to intervene *ex mero motu* during the following portion of closing argu-

ments when the prosecutor expressed disbelief of a statement made by defendant:

> Anyway, [defendant] changes his statement and he says, "It's pretty much the way I told you except for I went in. I carried a gun into the store that I got off of 'B.' "
>
> But he's still not quite ready to take all the responsibility because he says—and I saw some of you when this statement was read and I know that you didn't believe it, just like I don't— "I fired three times without aiming because I didn't want to hit my friend." Fired three times without aiming, in a direction without aiming."

Defendant did not object to these remarks at trial. The prosecutor continued:

> Well, aren't you just as likely to hit him without aiming as you are to hit him with aiming? I mean, who fires three times meaning not to hit somebody without aiming? I aimed at the ceiling 'cause I didn't want to hit him. I aimed at the side rack 'cause I didn't want to hit him. I aimed somewhere else 'cause I didn't want to hit him. But I fired three times without aiming 'cause I didn't want to hit my friend.

"[W]e will not find error in a trial court's failure to intervene in closing arguments *ex mero motu* unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair." *State v. Allen*, 360 N.C. 297, 306-07, 626 S.E.2d 271, 280, *cert. denied*, 549 U.S. 867 (2006). In determining whether argument was grossly improper, this Court considers "the context in which the remarks were made," *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046 (1994), as well as their brevity relative to the closing argument as a whole, *see State v. Fletcher*, 354 N.C. 455, 484-85, 555 S.E.2d 534, 552 (2001) (reasoning that when "[t]he offending comment was not only brief, but . . . was made in the context of a proper . . . argument," it was not grossly improper), *cert. denied*, 537 U.S. 846 (2002).

Here, the prosecutor's statement, "I know that you didn't believe it, just like I don't," was a small part of an otherwise proper argument that the jury should not believe defendant's statement that he fired without aiming because: (1) defendant's version of the events surrounding the murder was not credible, as evidenced by his changing his story when confronted with a videotape confirming his presence

inside the store; and (2) the statement was absurd on its face. Although the prosecutor should not have indicated his personal disbelief of defendant's statement, given the overall context and the brevity of the remark, it was not "so grossly improper" as to render the proceeding "fundamentally unfair." *See Allen*, 360 N.C. at 306-07, 626 S.E.2d at 280.

**[5]** Defendant next argues the trial court erred by denying his motion for mistrial based on an allegedly prejudicial incident involving contact between a juror and an outside party.

Near the end of the guilt-innocence phase of trial, the trial court dismissed the jury from the courtroom and called a person from the gallery forward. The trial court confronted the person with a report by a juror that when the juror left the courthouse on a prior afternoon, the person followed the juror's automobile for some distance. The person denied the allegation. The trial court nevertheless cautioned the person to stay away from jurors, and the person indicated his understanding. Later in the day, after the state rested its case, the trial court inquired of both the juror who reported the incident and a second juror who claimed to have witnessed it. The trial court asked each juror whether the incident affected that juror's ability to be fair and impartial in the trial of the case, and both jurors responded that it did not. When the two jurors related that they had discussed the incident with other jurors, the trial court brought out all of the jurors and inquired generally as to whether an alleged incident that occurred during the previous week affected their ability to be fair and impartial. All jurors responded negatively.

The following day, defendant moved for a mistrial. Defendant argued that because the person in question had been seated with defendant's family during part of the trial and was seen with them around the courthouse, the jury might associate the person's behavior with defendant, thereby prejudicing defendant. The trial court denied the motion, noting that the jurors had indicated their ability to be fair and impartial and that "the jurors do not know the identity of the person who allegedly followed them or what his connection is with any of the parties." On appeal, defendant contends the trial court's denial of his motion for mistrial was error and violated his right to a fair and impartial jury trial.

A trial court must declare a mistrial "if there occurs during the trial . . . conduct inside or outside the courtroom [that results] in substantial and irreparable prejudice to the defendant's case." N.C.G.S.

§ 15A-1061 (2007). " 'Mistrial is a drastic remedy, warranted only for such serious improprieties as would make it impossible to attain a fair and impartial verdict.' " *State v. Smith*, 320 N.C. 404, 418, 358 S.E.2d 329, 337 (1987) (quoting *State v. Stocks*, 319 N.C. 437, 441, 355 S.E.2d 492, 494 (1987)). The decision to grant or deny a mistrial lies within the sound discretion of the trial court and is "entitled to great deference since [the trial court] is in a far better position than an appellate court to determine the effect of any [misconduct] on the jury." *State v. Thomas*, 350 N.C. 315, 341, 514 S.E.2d 486, 502, *cert. denied*, 528 U.S. 1006 (1999). Absent an abuse of discretion, therefore, the trial court's ruling will not be disturbed on appeal. *Id.* An abuse of discretion occurs when a ruling is "manifestly unsupported by reason, which is to say it is so arbitrary that it could not have been the result of a reasoned decision." *State v. T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998).

Here, the trial court properly sought to determine the effect on the jury of any misconduct by thoroughly questioning all parties allegedly involved in or affected by the incident. The trial court reprimanded and warned the person who allegedly followed the juror, specifically questioned the two jurors involved in the incident and received their individual assurances of impartiality, and inquired generally of all jurors and received their assurances of impartiality. Additionally, there is no evidence tending to show the jurors were incapable of impartiality or were in fact partial in rendering their verdict. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for mistrial.

**[6]** Defendant next argues the trial court erred by denying his motion to dismiss the charge of attempted robbery with a dangerous weapon of Mr. Butts. When reviewing a sufficiency of the evidence claim, this Court considers whether the evidence, taken in the light most favorable to the state and allowing every reasonable inference to be drawn therefrom, constitutes "substantial evidence of each element of the crime charged." *State v. Davis*, 340 N.C. 1, 11-12, 455 S.E.2d 627, 632, *cert. denied*, 516 U.S. 846 (1995). "Substantial evidence means that the evidence must be existing and real, not just seeming or imaginary." *Id.* at 12, 455 S.E.2d at 632 (internal quotation marks omitted) (quoting *State v. Clark*, 325 N.C. 677, 682, 386 S.E.2d 191, 194 (1989)).

" '[A]n attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about this

result.' " *Id.* (quoting *State v. Allison*, 319 N.C. 92, 96, 352 S.E.2d 420, 423 (1987)). The overt act must "go[] beyond mere preparation but fall[] short of the completed offense." *Id.* A defendant may attempt robbery with a dangerous weapon even when the defendant neither demands nor takes money from the victim. *See Davis*, 340 N.C. at 12-13, 455 S.E.2d at 632-33. For example, in *State v. Davis*, the following facts amounted to sufficient evidence of attempted robbery with a dangerous weapon: the defendants had been in a certain pawn shop two previous times on the day of the incident; the defendants entered the pawn shop for a third time just before closing and drew their pistols; one defendant said to the shop's proprietor, "Buddy, don't even try it"; and the defendants fled the shop without taking money or valuables when a gunfight erupted among the three. *Id.* at 12, 455 S.E.2d at 632. This Court determined the defendants' actions of drawing their pistols and their words, "Buddy, don't even try it," demonstrated their intent to rob and constituted an overt act in furtherance thereof. *Id.* at 12-13, 455 S.E.2d at 632-33; *see also State v. Smith*, 300 N.C. 71, 77-78, 80-81, 265 S.E.2d 164, 169-71 (1980) (holding evidence of attempted robbery with a dangerous weapon sufficient when the defendant pointed a gun at a convenience store proprietor and stated, "Don't move" and "Don't put your hands under that counter," but fled when a third party drove past the store and waved at the proprietor).

The instant case is analogous to *Davis*. Just as the defendants in *Davis* familiarized themselves with the pawn shop before the robbery, 340 N.C. at 12, 455 S.E.2d at 632, so too defendant and Crawley reviewed a diagram of Mitch's Grocery and were aware that large sums of money were kept on hand there for video poker games. These facts tend to support the state's contention that defendant intended to rob clientele of the store's video poker machines. Moreover, in the same way that the defendants in *Davis* drew their weapons and warned the victim not to "try it," *id.*, defendant in this case approached Mr. Butts from behind, pointed a gun at him, and indicated he should "stay still" and empty his pockets. These words and actions are evidence of both defendant's intent to rob Mr. Butts and an "overt act calculated to bring about" that result. *See id.* Having manifested an intent to rob Mr. Butts and performed an overt act in furtherance thereof, defendant's attempted robbery with a dangerous weapon was complete, despite the fact that defendant, without taking money from Mr. Butts, moved on to Mrs. Butts when she proved an easier target and ran from the store after the gunfight. *See Davis*, 340 N.C. at 12-13, 15, 455 S.E.2d at 632-34 (holding evidence of

robbery with a dangerous weapon sufficient when, following a gun-fight, the defendants fled the store without taking money). Accordingly, the state presented substantial evidence of attempted robbery with a dangerous weapon, and the trial court properly denied defendant's motion to dismiss.

[7] Defendant also argues the trial court erred by instructing the jurors, over defendant's objection, that they could consider evidence of flight in determining whether defendant committed murder. "A trial court may properly instruct on flight where there is some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged." *State v. Lloyd*, 354 N.C. 76, 119, 552 S.E.2d 596, 625 (2001) (internal quotation marks omitted) (quoting *State v. Allen*, 346 N.C. 731, 741, 488 S.E.2d 188, 193 (1997)). Evidence that the defendant hurriedly left the crime scene without rendering assistance to the homicide victim may warrant an instruction on flight. *See, e.g., State v. Anthony*, 354 N.C. 372, 425, 555 S.E.2d 557, 591 (2001) (holding evidence sufficient to warrant flight instruction when, after shooting the victim, "defendant immediately entered his car and quickly drove away from the crime scene without rendering any assistance to the victims or seeking to obtain medical aid for them"), *cert. denied*, 536 U.S. 930 (2002).

In the instant case, the evidence tended to show defendant left Mitch's Grocery hurriedly without aiding the Facianes or the Buttses and sought to avoid apprehension for the murder. Defendant himself told law enforcement officers that he "*ran* for the door after shooting," "*ran* out of the door and threw the wallet down on the way out," and "*ran* to the right when [he] left the store." (emphases added). At no point did defendant attempt to provide or obtain medical assistance for the victims. Instead, he drove to a hospital in a different county, where he misled hospital staff regarding the location of the incident and misled investigating officers regarding his role in the incident. Taken together, these actions constitute substantial "evidence . . . reasonably supporting the theory that the defendant fled after the commission of the crime charged." *Lloyd*, 354 N.C. at 119, 552 S.E.2d at 625 (internal quotation marks omitted) (quoting *Allen*, 346 N.C. at 741, 488 S.E.2d at 193).

Even assuming *arguendo* that the instruction on flight was improper, it cannot reasonably be said to have prejudiced defendant. Evidence that a bullet from defendant's gun went through the victim's abdomen and lodged in his underwear, combined with defendant's own confession to law enforcement, provided overwhelming evi-

dence that defendant committed the murder. In addition, the " 'trial court's instruction correctly informed the jury that proof of flight was not sufficient by itself to establish guilt and would not be considered as tending to show premeditation and deliberation.' " *Id.* at 120, 552 S.E.2d at 626 (quoting *State v. Grooms*, 353 N.C. 50, 81, 540 S.E.2d 713, 732 (2000), *cert. denied*, 534 U.S. 838 (2001)). Thus, defendant's argument is without merit.

**[8]** Defendant next contends he was deprived of his right to a unanimous jury verdict because the trial court did not specifically instruct the jurors as to which robbery with a dangerous weapon they should consider as the underlying felony for the purpose of finding felony murder. The trial court's felony murder instructions were implicitly disjunctive, as they generally referred to the robbery of "a person" without specifically referring to defendant's robbery of the Facianes or Mrs. Butts.

Article.I, Section 24 of the North Carolina Constitution provides that "[n]o person shall be convicted of any crime but by the unanimous verdict of a jury in open court." *See also* N.C.G.S. § 15A-1237(b) (2007) ("The verdict must be unanimous . . . ."). It is well established, however, that "if the trial court merely instructs the jury disjunctively as to various alternative acts which will establish an element of the offense, the requirement of unanimity is satisfied." *State v. Lyons*, 330 N.C. 298, 303, 412 S.E.2d 308, 312 (1991) (emphasis omitted); *see also State v. Hartness*, 326 N.C. 561, 563, 567, 391 S.E.2d 177, 178, 180-81 (1990) (holding that when a defendant is charged with "a single offense which may be proved by evidence of the commission of any one of a number of acts," an instruction that does not specify which of those acts the jury should consider is not fatally ambiguous such that it risks a nonunanimous verdict).

The trial court's instructions here allowed the jury to find defendant guilty of felony murder if it found he committed either robbery with a dangerous weapon of the Facianes or robbery with a dangerous weapon of Mrs. Butts. Because either of these alternative acts established an element of felony murder—namely, the commission of one of the several felonies enumerated in N.C.G.S. § 14-17—the requirement of jury unanimity was satisfied. *See Lyons*, 330 N.C. at 303, 412 S.E.2d at 312; *Hartness*, 326 N.C. at 567, 391 S.E.2d at 180-81; *cf. State v. Coleman*, 161 N.C. App. 224, 234-35, 587 S.E.2d 889, 896 (2003) (upholding jury finding of felony murder when the trial court instructed the jury in the disjunctive as to four separate felonies that could have served as the predicate felony, even though the trial

court's instructions were "ambiguous as to what underlying felony formed the basis of the felony murder charge"). Accordingly, defendant's argument fails.

**[9]** In his final guilt-innocence phase argument, defendant claims the trial court erred by failing to arrest judgment on the robbery with a dangerous weapon charges underlying his felony murder conviction. " '[W]here defendant is convicted of first-degree murder based upon both premeditation and deliberation and felony murder, the underlying felony does not merge with the murder conviction and the trial court is free to impose a sentence thereon.' " *State v. Robinson*, 342 N.C. 74, 82-83, 463 S.E.2d 218, 223 (1995) (quoting *State v. Bell*, 338 N.C. 363, 394, 450 S.E.2d 710, 727 (1994), *cert. denied*, 515 U.S. 1163 (1995)), *cert. denied*, 517 U.S. 1197 (1996). Here, defendant was convicted of first-degree murder both on the basis of premeditation and deliberation and under the felony murder rule. Consequently, neither the robbery with a dangerous weapon of the Facianes nor the robbery with a dangerous weapon of Mrs. Butts merged with the murder conviction, and the trial court did not err in failing to arrest judgment on those charges.

## CAPITAL SENTENCING PROCEEDING

Defendant makes several arguments with respect to the pecuniary gain aggravating circumstance. *See* N.C.G.S. § 15A-2000(e)(6) (2007) ("The capital felony was committed for pecuniary gain.").

**[10]** We first consider defendant's argument that the trial court's instruction on the pecuniary gain aggravating circumstance constituted plain error because it allegedly failed to state the requirement that the murder must have been for the purpose of financial gain. The trial court instructed the jury as follows:

[W]as the murder committed for pecuniary gain? A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained or intends or expects to obtain money or some other thing which can be valued in money, either as compensation for committing it or as a result of the death of the victim.

If you find from the evidence, beyond a reasonable doubt, that when the defendant killed the victim the defendant took money and other valuable property from the victim and that he intended or expected to obtain money or other things of value that can be valued in money as a result of the victim's death, if you find this aggravating circumstance you will so indicate . . . .

Because defendant did not object to the instruction at trial, we review for plain error. *See State v. Duke*, 360 N.C. 110, 138, 623 S.E.2d 11, 29 (2005), *cert. denied*, 549 U.S. 855, (2006); *see also* N.C. R. App. P. 10(c)(4) (allowing for plain error review of certain unpreserved issues in criminal cases). A reversal for plain error is only appropriate in the most exceptional circumstances and when the defendant establishes that "absent the error, the jury probably would have reached a different result." *State v. Cummings*, 352 N.C. 600, 616, 536 S.E.2d 36, 49 (2000) (internal quotation marks omitted) (quoting *State v. Sierra*, 335 N.C. 753, 761, 440 S.E.2d 791, 796 (1994)), *cert. denied*, 532 U.S. 997 (2001).

"The gravamen of the pecuniary gain aggravating circumstance is that the killing was for the purpose of getting money or something of value." *State v. Chandler*, 342 N.C. 742, 754, 467 S.E.2d 636, 643 (internal quotation marks omitted) (quoting *State v. Jennings*, 333 N.C. 579, 621, 430 S.E.2d 188, 210, *cert. denied*, 510 U.S. 1028 (1993)), *cert. denied*, 519 U.S. 875 (1996). The circumstance applies only when " 'the hope of pecuniary gain provided the impetus for the murder,' " *id.* (quoting *State v. Oliver*, 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981)), and not when, for example, "the taking was a mere act of opportunism committed after a murder was perpetrated for another reason," *State v. Maske*, 358 N.C. 40, 54, 591 S.E.2d 521, 530 (2004). Thus, an instruction that conveys to the jury that its "finding of robbery with a dangerous weapon . . . would automatically mandate the finding of the [pecuniary gain] aggravator" is erroneous. *State v. Jones*, 357 N.C. 409, 419-20, 584 S.E.2d 751, 758 (2003).

In considering jury instructions on the pecuniary gain aggravating circumstance, this Court has distinguished between instructions that explain, define, or describe pecuniary gain and those that "simply direct[] that if the jury [finds] robbery with a dangerous weapon, then the jury [would] find the pecuniary gain aggravating circumstance." *Id.* at 419-20, 584 S.E.2d at 758-59. For example, in *State v. Jones*, the trial court committed plain error by instructing the jury: "If you find from the evidence beyond a reasonable doubt . . . that when the defendant killed the victim, the defendant was in the commission of robbery with a dangerous weapon, you would find [the pecuniary gain] aggravating circumstance. . . ." *Id.* at 418-20, 584 S.E.2d at 757-58 (emphasis omitted). Similarly, in *State v. Maske*, the trial court erred by instructing the jury: "If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, the defendant took $200 from the victim's purse, you would

find [the pecuniary gain] aggravating circumstance . . . ." 358 N.C. at 56-57, 591 S.E.2d at 531-32. *Jones* and *Maske* both distinguish the pecuniary gain instruction upheld by this Court in *State v. Davis*, 353 N.C. 1, 36-37, 539 S.E.2d 243, 266-67 (2000), *cert. denied*, 534 U.S. 839 (2001), which read in part:

> If you find, from the evidence beyond a reasonable doubt, that when the defendant killed the victim, that the defendant took personal property or other items belonging to [the victim] and that he intended or expected to obtain money or property or any other thing that can be valued in money, you would find [the pecuniary gain] aggravating circumstance.

*See Maske*, 358 N.C. at 56, 591 S.E.2d at 532 (stating that the instruction in *Davis* "is distinguishable from the one given here"); *Jones*, 357 N.C. at 421, 584 S.E.2d at 759 (citing with approval the instruction in *Davis* and indicating it adequately described pecuniary gain).

The instruction in the present case was substantially similar to the instruction upheld by this Court in *Davis*. A side-by-side comparison of the two instructions reveals that both define and describe pecuniary gain in a similar manner. The trial court in *Davis* instructed the jurors to find the pecuniary gain circumstance if they determined "that when the defendant killed the victim . . . he intended or expected to obtain money or property or any other thing that can be valued in money." 353 N.C. at 36, 539 S.E.2d at 266. Likewise, the trial court in the instant case instructed the jurors to find the pecuniary gain circumstance if they determined "that when the defendant killed the victim . . . he intended or expected to obtain money or other things of value that can be valued in money as a result of the victim's death." The instruction did not "simply direct[] that if the jury found robbery with a dangerous weapon, then the jury would find the pecuniary gain aggravating circumstance," *see Jones*, 357 N.C. at 420, 584 S.E.2d at 758, and it did not remove from the jury the requirement that it find the murder was motivated by a hope or expectation of pecuniary gain. Accordingly, the instruction was not plain error.

In light of this holding and because defendant, in his brief to this Court, acknowledges that the trial court's instruction on pecuniary gain was "essentially consistent with the pattern instructions," we also reject defendant's argument that defense counsel's failure to object to the instruction or to request a special instruction constituted ineffective assistance of counsel.

**[11]** Defendant next argues the trial court erred by failing to intervene *ex mero motu* during the state's closing argument related to the pecuniary gain aggravating circumstance. Trial counsel are permitted wide latitude in arguing hotly contested cases, and the "scope of jury arguments is left largely to the control and discretion of the trial court." *State v. Peterson*, 361 N.C. 587, 606, 652 S.E.2d 216, 229 (2007) (internal quotation marks omitted) (quoting *Allen*, 360 N.C. 297, 306, 626 S.E.2d 271, 280, *cert. denied*, 549 U.S. 867 (2006)), *cert. denied*, —— U.S. ——, 128 S. Ct. 1682 (2008). "These principles apply not only to ordinary jury arguments, but also to arguments made in capital sentencing proceedings, and the boundaries for jury argument at the capital sentencing proceeding are more expansive than at the guilt phase." *State v. Thomas*, 350 N.C. 315, 360, 514 S.E.2d 486, 513-14 (citing *State v. Bishop*, 343 N.C. 518, 552, 472 S.E.2d 842, 860 (1996), *cert. denied*, 519 U.S. 1097 (1997)), *cert. denied*, 528 U.S. 1006 (1999).

" 'The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*.' " *State v. McNeill*, 360 N.C. 231, 244, 624 S.E.2d 329, 338 (quoting *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002)), *cert. denied*, —— U.S. ——, 127 S. Ct. 396 (2006). "Under this standard, 'only an extreme impropriety on the part of the prosecutor will compel this Court to·hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.' " *State v. Anthony*, 354 N.C. 372, 427, 555 S.E.2d 557, 592 (2001) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890 (1996)), *cert. denied*, 536 U.S. 930 (2002). The defendant will not prevail on appeal unless "the sentencing hearing was so infected with unfairness by the prosecutor's comments as to violate defendant's due process rights." *State v. Braxton*, 352 N.C. 158, 219, 531 S.E.2d 428, 464 (2000), *cert. denied*, 531 U.S. 1130 (2001).

Here, the prosecutor argued to the jury:

Now, when considering what the punishment shall be, you will be given instructions by His Honor as to how to proceed with that. He will tell you what they are, and he will instruct you. . . . You'll have two aggravating circumstances to consider. The first one is whether the murder was committed during a—whether the murder was committed for pecuniary gain; pecuniary, money.

Was Mitch's death the result of the defendant getting money, and Jamel Crawley, from the store? They accomplished that, the money and receipts.

Now, I contend that you have already found that aggravating circumstance because you have found the defendant guilty of conspiracy to commit robbery of the store and also robbery of the store. Now, you must find beyond a reasonable doubt, and all 12 jurors unanimously, whether that aggravating circumstance exists.

Defendant contends the jurors would have understood these statements to mean that the guilty verdicts on the charges of robbery with a dangerous weapon and conspiracy to commit robbery with a dangerous weapon automatically required them to find the pecuniary gain aggravating circumstance as well. According to defendant, the statements were thus grossly improper.

"A trial court is not required to intervene *ex mero motu* where a prosecutor makes comments during closing argument which are substantially correct shorthand summaries of the law, even if slightly slanted toward the State's perspective." *State v. Barden*, 356 N.C. 316, 366, 572 S.E.2d 108, 140 (2002) (internal quotation marks omitted) (quoting *State v. Warren*, 347 N.C. 309, 322, 492 S.E.2d 609, 616 (1997), *cert. denied*, 523 U.S. 1109 (1998)), *cert. denied*, 538 U.S. 1040 (2003). Moreover, a prosecutor's misstatement of the law may be cured by the trial court's subsequent correct instructions. *Id.* In *State v. Barden*, we applied these principles to hold that, even when the defendant timely objected,. "[t]he prosecutor's statement that armed robbery 'is' pecuniary gain was not so wide of the mark as to constitute reversible error." *Id.*

In the instant case, the prosecutor distinguished between what "I [the state] contend" about pecuniary gain on the one hand and what "you [the jury] must find" about pecuniary gain on the other hand. Additionally, the prosecutor told the jurors they should look to the trial court for explanation and instruction on the aggravating circumstances, and we have already concluded the trial court's instructions on pecuniary gain were proper. Therefore, the prosecutor's remarks were not so grossly improper that the trial court erred by failing to intervene *ex mero motu*.

**[12]** Defendant also claims he was afforded ineffective assistance of counsel when defense counsel conceded the existence of the pecu-

niary gain aggravating circumstance during closing argument. Defense counsel stated as follows: "[The aggravating circumstances] are, number one, 'Was this murder committed for pecuniary gain?' Was there a robbery? As [the prosecutor] said, you've already found that."

"To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his counsel's performance was deficient and then that counsel's deficient performance prejudiced his defense." *State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)), *cert. denied*, 549 U.S. 867 (2006). Performance is "deficient" when counsel's representation falls beneath an objective standard of reasonableness, *id.*, or when counsel's errors are "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *State v. Augustine*, 359 N.C. 709, 719, 616 S.E.2d 515, 524 (2005) (internal quotation marks omitted) (quoting *State v. Braswell*, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985)), *cert. denied*, 548 U.S. 925 (2006). "[T]o establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Allen*, 360 N.C. at 316, 626 S.E.2d at 286 (internal quotation marks omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

Here, defense counsel briefly conceded the existence of the pecuniary gain aggravating circumstance before shifting focus to a lengthy discussion of the mitigating circumstances. This concession was consistent with defense counsel's overall strategy throughout the proceedings to exude openness and truthfulness with the jury and was reasonable in light of the abundant evidence tending to show the murder was committed for pecuniary gain. Defendant's own statement to law enforcement officers indicated that he and Crawley entered Mitch's Grocery armed and familiar with the specific location behind the counter where money was kept. Once inside the store, defendant took a billfold from a store customer, Mrs. Butts, while Crawley demanded money from the store's owner, Mrs. Faciane. When the victim resisted the robbery of his store, defendant shot and killed him. Defendant then fled the scene with Crawley, who had taken cash and receipts from the store's register. In the face of such strong evidence suggesting the murder was committed for pecuniary gain, we cannot say defense counsel's brief concession was objectively unreasonable or that, had counsel not so conceded, the jury

probably would have returned a sentence of life imprisonment. Thus, defendant's ineffective assistance of counsel claim fails.

**[13]** Defendant next argues the trial court erred by failing to submit to the jury the mitigating circumstance that defendant had no significant history of prior criminal activity. *See* N.C.G.S. § 15A-2000(f)(1) (2007). In support, defendant relies on the testimony of his two mental health experts, forensic psychiatrist Dr. Moira Artigues and forensic psychologist Dr. Brad Fisher, and three of his former schoolteachers. Dr. Artigues testified regarding defendant's background, particularly as it related to his emotional and mental health. She diagnosed defendant with the following disorders: Depressive Disorder Not Otherwise Specified, Personality Disorder Not Otherwise Specified with Borderline, Avoidant, and Dependent Traits, Cannabis Dependence, Major Depressive Disorder by history, Dysthymic Disorder by history, and Neglected Child by history. Dr. Fisher agreed in substance with the diagnoses and opinions of Dr. Artigues. The testimony of defendant's teachers centered primarily on his impoverished upbringing and learning disabilities. Defendant offered no evidence of his criminal record, and defense counsel twice indicated to the trial court that defendant was not seeking submission of the (f)(1) mitigating circumstance. Nevertheless, defendant now argues he was entitled to an (f)(1) instruction because the testimony of his sentencing witnesses allegedly depicted a comprehensive life history from which significant criminal activity was absent. Specifically, defendant asserts that testimony that he had not used drugs besides marijuana, had not been charged with any alcohol-related offenses, had not been in many fights at school, and had worked for a brick mason for many years amounted to substantial evidence that marijuana use and underage drinking constituted the extent of his criminal history.

The trial court must submit the (f)(1) mitigating circumstance "whenever [it] finds substantial evidence on which a reasonable jury could determine that a defendant has no significant history of prior criminal activity." *State v. Hurst*, 360 N.C. 181, 197, 624 S.E.2d 309, 322, *cert. denied*, 549 U.S. 875 (2006). "The statutory mitigating circumstance of no significant history of prior criminal activity is not supported by the mere absence of any substantial evidence concerning the defendant's prior criminal history." *State v. Gibbs*, 335 N.C. 1, 56, 436 S.E.2d 321, 352 (1993) (internal quotation marks omitted) (quoting *State v. Laws*, 325 N.C. 81, 111, 381 S.E.2d 609, 627 (1989), *sentence vacated on other grounds*, 494 U.S. 1022 (1990)), *cert.*

*denied*, 512 U.S. 1246 (1994). Thus, "when the record is silent as to a defendant's criminal history, no (f)(1) instruction is appropriate." *Hurst*, 360 N.C. at 198, 624 S.E.2d at 322.

Furthermore, mere references to illegal drug use are insufficient to constitute substantial evidence of a defendant's criminal history or lack thereof. *See, e.g., State v. Powell*, 340 N.C. 674, 693, 459 S.E.2d 219, 228 (1995), *cert. denied*, 516 U.S. 1060 (1996); *Laws*, 325 N.C. at 110-11, 381 S.E.2d at 626-27. For example, in *State v. Powell*, the record did not contain sufficient evidence to warrant an instruction on the (f)(1) mitigating circumstance when "[t]he only such evidence consisted of testimony about defendant's cocaine use and a passing reference by a witness to the fact that defendant was temporarily released from jail to attend his father's funeral." 340 N.C. at 693, 459 S.E.2d at 228. Similarly, in *State v. Laws*, this Court rejected the defendant's argument that a witness's references to his marijuana use constituted substantial evidence of his lack of significant history of criminal activity. 325 N.C. at 110-11, 381 S.E.2d at 626-27. We concluded that "[a] jury finding of no significant history of criminal activity, solely upon [the witness's] remarks about marijuana use, would have been based purely upon speculation and conjecture, not upon substantial evidence, and unreasonable as a matter of law." *Id.* at 111, 381 S.E.2d at 627; *see also State v. Gainey*, 355 N.C. 73, 101, 558 S.E.2d 463, 481 (holding testimony by defense witnesses that defendant "had been in no real or 'bad trouble' and had not been involved with illegal drugs or weapons" was insufficient to support submission of the (f)(1) mitigating circumstance), *cert. denied*, 537 U.S. 896 (2002).

Likewise, in the instant case, testimony that defendant used marijuana but not other drugs, drank while underage but was never charged, and did not get in many fights at school is not substantial evidence that defendant lacked a significant history of prior criminal activity. Defendant's experts, who referenced defendant's drug and alcohol use in support of their medical diagnoses, did not expound upon the criminal aspect of defendant's substance abuse, nor did they testify regarding other crimes or the lack thereof that might have formed the basis of a determination regarding defendant's criminal history. In sum, the evidence cited by defendant begged further development in order to support submission of the (f)(1) mitigating circumstance, and the jury's finding of the circumstance on the strength of that evidence alone "would have been based purely upon speculation and conjecture . . . and unreasonable as a matter of law." *Laws*,

325 N.C. at 111, 381 S.E.2d at 627. Therefore, the trial court did not err in failing to submit the (f)(1) mitigating circumstance.

**[14]** Defendant next contends the trial court committed plain error by failing to give individualized instructions and explanations for each of the thirty-two nonstatutory mitigating circumstances submitted to the jury and by giving a single peremptory instruction for those mitigating circumstances. According to defendant, the trial court's manner of instructing the jury improperly suggested the nonstatutory mitigating circumstances were of less significance than the statutory mitigating circumstances. Because defendant did not object to the instruction at trial, we review for plain error. *See Duke*, 360 N.C. at 138, 623 S.E.2d at 29.

This Court rejected an argument similar to that of defendant in *State v. Trull*, 349 N.C. 428, 509 S.E.2d 178 (1998), *cert. denied*, 528 U.S. 835 (1999). There, the trial court did not separately instruct on each of the twenty-four nonstatutory mitigating circumstances and tendered a single peremptory instruction for all of them. *Id.* at 455, 509 S.E.2d at 195-96. Reasoning that "jury instructions should be as clear as practicable, without needless repetition" and that "jurors are presumed to pay close attention to the particular language of the judge's instructions," we held the defendant failed to show that "had the judge repeated the same instructions regarding nonstatutory mitigating circumstances twenty-four times, the jury probably would have reached a different verdict." *Id.* at 455-56, 509 S.E.2d at 196. Moreover, "this Court has repeatedly approved of trial judges issuing one peremptory instruction for multiple nonstatutory mitigating circumstances." *Id.* at 456, 509 S.E.2d at 196 (citing *State v. Bonnett*, 348 N.C. 417, 447-48, 502 S.E.2d 563, 583 (1998), *cert. denied*, 525 U.S. 1124 (1999)).

Here, the trial court clearly instructed the jury to consider each of the potential nonstatutory mitigating circumstances. Furthermore, one or more jurors found thirty of the thirty-two submitted nonstatutory mitigating circumstances. Like the defendant in *Trull*, defendant here has failed to show that had the trial court given individualized instruction and explanation for each of these circumstances, the jury probably would have reached a different verdict. *See id.* Therefore, the instruction did not constitute plain error.

**[15]** Defendant next argues the pecuniary gain aggravating circumstance was supported by insufficient evidence because defendant did not personally take money from Mr. Faciane and the trial court

did not instruct on acting in concert in the context of the pecuniary gain instruction.

"If there is substantial evidence defendant's motive in the killing was the gain of something of pecuniary value . . . the [pecuniary gain] circumstance is properly submitted." *Allen*, 360 N.C. at 312, 626 S.E.2d at 283. The pecuniary gain aggravating circumstance " 'requires the jury to consider not defendant's actions but his motive' for killing the victim[]." *State v. Tirado*, 358 N.C. 551, 599, 599 S.E.2d 515, 546 (2004) (quoting *State v. Green*, 321 N.C. 594, 610, 365 S.E.2d 587, 597, *cert. denied*, 488 U.S. 900 (1988)), *cert. denied*, 544 U.S. 909 (2005). Thus, for a murder to be committed "for pecuniary gain," N.C.G.S. § 15A-2000(e)(6), there is no requirement that the defendant actually take money from the victim, whether personally or acting in concert with another. *See State v. Chandler*, 342 N.C. 742, 754-56, 467 S.E.2d 636, 643-44 (upholding submission of the pecuniary gain aggravating circumstance when the defendant did not take money or property from the victim), *cert. denied*, 519 U.S. 875 (1996).

Here, substantial evidence tended to show defendant committed the murder for pecuniary gain. Defendant and Crawley possessed a diagram of Mitch's Grocery and were aware that store customers sometimes won large sums of money from the video poker machines. The two entered the store armed and demanded money from people inside, including Mrs. Faciane. When Mr. Faciane resisted, defendant shot and killed him. These facts are sufficient evidence that defendant's "motive in the killing was the gain of something of pecuniary value." *See Allen*, 360 N.C. at 312, 626 S.E.2d at 283.

**[16]** Defendant also contends the trial court erred by failing to intervene *ex mero motu* during the state's closing argument related to the course of conduct aggravating circumstance. The prosecutor argued as follows:

The second [aggravating circumstance] is called course of conduct, whether the murder was committed while the defendant was in a course of conduct of robbery of Sandra Butts and attempted robbery of Barry Butts. In fact, he was back at the back of the store robbing the two of them and then came forward and shot Mitch and shot at Dawn. And I contend, the State contends that you have found that aggravating circumstance already because you have already found the defendant guilty of robbery with a dangerous weapon of Sandra Butts and attempted robbery with a dangerous weapon of Barry Butts.

But, again, you must consider that, and all 12 of you find beyond a reasonable doubt whether that aggravating circumstance exists.

A jury should find the course of conduct aggravating circumstance when the murder "was part of a course of conduct in which the defendant engaged and which included the commission . . . of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11) (2007). Defendant complains that the prosecutor's remarks erroneously informed the jurors that the guilty verdicts on the charges of robbery with a dangerous weapon and attempted robbery with a dangerous weapon automatically required them to find the course of conduct aggravating circumstance as well.

The prosecutor's closing argument with respect to the course of conduct aggravating circumstance was similar to his argument with respect to the pecuniary gain aggravating circumstance. Here as well, the prosecutor distinguished between what "I [the state] contend" about defendant's course of conduct on the one hand and what "you [the jury] must consider . . . and . . . find" about defendant's course of conduct on the other hand. Further, the trial court correctly instructed the jury on the course of conduct aggravating circumstance, thus curing any misstatement of law by the prosecutor. *See Barden*, 356 N.C. at 366, 572 S.E.2d at 140 (explaining a prosecutor's misstatement of law may be cured by the trial court's subsequent correct instructions). For the same reasons the prosecutor's remarks regarding the pecuniary gain aggravating circumstance were not grossly improper, the prosecutor's remarks regarding the course of conduct aggravating circumstance were not grossly improper. *See McNeill*, 360 N.C. at 244, 624 S.E.2d at 338 (stating that the standard of review for assessing allegedly improper closing arguments to which opposing counsel failed to object is whether the remarks were so grossly improper that the trial court erred by not intervening *ex mero motu*).

[17] Defendant next argues the trial court erred by denying his motion for mistrial based on an allegedly prejudicial incident involving contact between two jurors and two state's witnesses during the capital sentencing proceeding.

Before the beginning of jury deliberations on the morning of 24 August 2005, the state reported the following to the trial court: The previous evening after the close of court, two jurors were outside, and one of their cars had a flat tire. The victim's two adult children,

who gave victim impact testimony during the sentencing proceeding, noticed the flat tire and held up a can of Fix-A-Flat. The jurors saw this gesture, but walked away. The victim's children then put down the can of Fix-A-Flat, got into their car, and drove away. No verbal communication occurred during the incident. After hearing the state's report, defense counsel declined the trial court's invitation to inquire of the involved jurors and instead moved for a mistrial.

The trial court must declare a mistrial only if conduct inside or outside the courtroom results in "substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061. The decision whether to grant or deny a mistrial is within the sound discretion of the trial court and is entitled to great deference on appeal. *State v. Thomas*, 350 N.C. 315, 341, 514 S.E.2d 486, 502, *cert. denied*, 528 U.S. 1006 (1999).

In support of his contention that the contact between the jurors and the victim's children substantially prejudiced his position at sentencing, defendant cites this Court's decision in *State v. Bailey*, 307 N.C. 110, 296 S.E.2d 287 (1982), in which we held that prejudicial error resulted from improper contact between a state's witness and members of the jury. *Id.* at 115, 296 S.E.2d at 290. In *Bailey*, a sheriff who testified on behalf of the state drove three jurors to a restaurant for an evening meal during a break in the jury's deliberations. *Id.* at 111, 296 S.E.2d at 288. In granting a new trial, this Court noted the importance of the sheriff's testimony at trial and also stated that our holding was "limited to the particular and peculiar circumstances of this case." *Id.* at 114-15, 296 S.E.2d at 289-90.

The facts of the present case are distinguishable from those of *Bailey*. Furthermore, here, any contact between the jurors and the two state's witnesses appears to have occurred at a distance and was nonverbal, fleeting, and unrelated to defendant's trial. Therefore, we cannot say the trial court abused its discretion in denying defendant's motion for mistrial.

**[18]** Defendant next asserts the trial court erred by failing to intervene *ex mero motu* at several points during the state's sentencing proceeding closing argument. Defendant did not object to any of these arguments at trial.

Defendant first claims the prosecutor misstated the law with regard to the jury's duty when weighing aggravating and mitigating circumstances, necessitating the trial court's *ex mero motu* in-

tervention. After discussing the aggravating and mitigating circumstances that would be submitted to the jury, the prosecutor stated the following: "You then weigh them to determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances. That means the State has to prove that they're either equal or that the aggravating circumstances outweigh the mitigating circumstances."

"Issue Three" on the capital sentencing recommendation form requires the jury to weigh the mitigating and aggravating circumstances. This Court has consistently rejected arguments that a jury is permitted "to recommend death if it finds that the mitigating circumstances are of equal weight and value to the aggravating circumstances found." *State v. Keel*, 337 N.C. 469, 493, 447 S.E.2d 748, 761 (1994), *cert. denied*, 513 U.S. 1198 (1995); *see also, e.g., Hurst*, 360 N.C. at 206, 624 S.E.2d at 327; *State v. King*, 353 N.C. 457, 491-92, 546 S.E.2d 575, 599-600 (2001), *cert. denied*, 534 U.S. 1147 (2002); *State v. Golphin*, 352 N.C. 364, 468-69, 533 S.E.2d 168, 235-36 (2000), *cert. denied*, 532 U.S. 931 (2001); *State v. Hunt*, 323 N.C. 407, 433, 373 S.E.2d 400, 416-17 (1988), *judgment vacated on other grounds*, 494 U.S. 1022 (1990), *and overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997). Thus, the prosecutor's statement was inconsistent with the law as articulated by this Court. Nevertheless, a prosecutor's misstatement of law with regard to the manner in which the jury should consider mitigating and aggravating circumstances may be cured by the trial court's subsequent correct instruction. *See, e.g., Barden*, 356 N.C. at 365-66, 572 S.E.2d at 139-40; *State v. Braxton*, 352 N.C. 158, 218-19, 531 S.E.2d 428, 463-64 (2000), *cert. denied*, 531 U.S. 1130 (2001); *State v. Geddie*, 345 N.C. 73, 99, 478 S.E.2d 146, 159-60 (1996), *cert. denied*, 522 U.S. 825 (1997); *State v. Buckner*, 342 N.C. 198, 238, 464 S.E.2d 414, 437 (1995), *cert. denied*, 519 U.S. 828 (1996). Here, the trial court properly instructed the jury in accordance with our case law regarding its duty at Issue Three, thereby curing any misstatement.

**[19]** Defendant also claims the trial court should have intervened *ex mero motu* when the prosecutor commented on the absence of any evidence showing defendant expressed remorse for the murder. After discussing various submitted mitigating circumstances, the prosecutor stated: "Nowhere in any of the testimony during the sentencing phase has remorse been mentioned about the defendant's remorse for Mitch's death." Defendant alleges this statement

improperly encouraged the jury to consider lack of remorse as an aggravating circumstance.

Although lack of remorse may not be submitted as an aggravating circumstance, a prosecutor may properly draw attention to a defendant's failure throughout the capital proceeding to demonstrate a sense of remorse. *State v. Brown*, 320 N.C. 179, 199, 358 S.E.2d 1, 15, *cert. denied*, 484 U.S. 970 (1987). Here, lack of remorse was not "placed before the jury for consideration as an aggravating [circumstance], either verbally or on the verdict sheet." *See id.* Accordingly, the prosecutor's remark was not grossly improper, and the trial court did not err in failing to intervene *ex mero motu*.

[20] Defendant next asserts the trial court should have intervened *ex mero motu* when the prosecutor referred to Dr. Moira Artigues, defendant's mental health expert, as a "professional witness" and incorrectly stated she was paid by the Center for Death Penalty Litigation.

" '[I]t is not improper for the prosecutor to impeach the credibility of an expert during his closing argument.' " *State v. Roache*, 358 N.C. 243, 300, 595 S.E.2d 381, 417 (2004) (quoting *State v. Norwood*, 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996), *cert. denied*, 520 U.S. 1158 (1997)). Furthermore, while a prosecutor should not " 'insinuate that [a] witness would perjure himself or herself for pay,' " it is entirely proper for the prosecutor to " 'point[] out that the witness' compensation may be a source of bias.' " *Id.* at 300, 595 S.E.2d at 418 (quoting *State v. Rogers*, 355 N.C. 420, 463, 562 S.E.2d 859, 885 (2002)). This Court has specifically addressed a situation in which a prosecutor characterized a defense witness as " 'a professional witness for the defendant' " and determined that such a characterization, "while inflammatory, was not improper to the point of being unduly prejudicial to defendant." *State v. Brewer*, 325 N.C. 550, 578-79, 386 S.E.2d 569, 585 (1989), *cert. denied*, 495 U.S. 951 (1990).

Likewise, in the instant case, the prosecutor's characterization of Dr. Artigues as a "professional witness" was not so grossly improper that the trial court erred by failing to intervene *ex mero motu*. Furthermore, although the prosecutor improperly stated that Dr. Artigues was paid by the Center for Death Penalty Litigation, "[t]his inaccuracy in the prosecutor's portrayal of the expert's [source of compensation] . . . did not so infect the trial with unfairness" as to deprive defendant of a fair sentencing proceeding. *See State v.*

*Cummings,* 352 N.C. 600, 627, 536 S.E.2d 36, 55 (2000), *cert. denied,* 532 U.S. 997 (2001).

**[21]** Defendant further contends the trial court erred by sustaining the state's objection to one of defendant's questions during redirect examination of Dr. Artigues. On cross-examination, the prosecutor elicited extensive testimony from Dr. Artigues concerning information about defendant's background contained in her reports. The prosecutor then elicited testimony that Dr. Artigues had testified as an expert in forensic psychiatry about forty times, but never for the state, that she had made three presentations to the North Carolina Trial Lawyers Association Capital College regarding the circumstances under which defense attorneys should retain mental health experts, and that she was being paid $275 per hour for her work on defendant's case.

On redirect examination by defense counsel, the following exchange occurred:

[DEFENSE COUNSEL]: And the fact that you're being paid and compensated for your time, has that influenced your opinions at all?

[DR. ARTIGUES]: No, it has not.

[DEFENSE COUNSEL]: The fact that you're being paid for your time, did that change any of the records that you received which corresponded to your opinions in this case?

[DR. ARTIGUES]: No, it did not.

[DEFENSE COUNSEL]: You didn't doctor any of these records at all because you're being paid—

[PROSECUTOR]: Objection.

[DEFENSE COUNSEL]: —did you?

THE COURT: Well, sustained as to that question.

According to defendant, the state's cross-examination of Dr. Artigues impugned both her character and her diagnoses by suggesting she was a "hired gun" for capital defendants, thereby opening the door to defendant's rebuttal question about whether Dr. Artigues "doctored" any records.

"[The] North Carolina Rules of Evidence permit broad cross-examination of expert witnesses." *State v. Bacon,* 337 N.C. 66, 88, 446

S.E.2d 542, 553 (1994) (citing N.C. R. Evid. 611(b)), *cert. denied,* 513 U.S. 1159 (1995). "[A] prosecutor's questions as to the amount of time [a defense expert] spent working with criminal cases and the number of cases in which [she has] testified for the State and for a defendant [are] entirely appropriate." *Rogers,* 355 N.C. at 455, 562 S.E.2d at 881. Thus, it was proper for the prosecutor to question Dr. Artigues regarding her forensic practice, the contents of the records to which she referred on direct examination, her status as a paid witness, and her potential bias.

Additionally, "[q]uestions asked on redirect should not go beyond matters discussed during cross-examination." *State v. Skipper,* 337 N.C. 1, 39, 446 S.E.2d 252, 273 (1994), *cert. denied,* 513 U.S. 1134 (1995), *superseded on other grounds by statute,* N.C.G.S. § 15A-2002, *as recognized in State v. Price,* 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied,* 514 U.S. 1021 (1995). Our review of the record reveals the prosecutor's questions relating to Dr. Artigues's records were straightforward without any intimation of wrongdoing. Certainly the prosecutor did not accuse Dr. Artigues of falsifying records. Therefore, defendant's contention that the prosecutor's cross-examination of Dr. Artigues "opened the door" to defense counsel's question, "You didn't doctor any of these records at all because you're being paid, did you?" is without merit.

We also observe that just before this question, defense counsel asked Dr. Artigues whether her being paid for her time "change[d] any of the records that [she] received which corresponded to [her] opinions in this case," and Dr. Artigues responded that it did not. She also testified that the payment she received for her time had not influenced her opinion. In light of this testimony, the question about doctoring the records was redundant, and an answer by Dr. Artigues would have added little to the information already before the jury. We therefore conclude that any error on the part of the trial court in sustaining the state's objection did not prejudice defendant.

[22] Defendant also challenges the prosecutor's closing argument references to various prison amenities defendant would enjoy if sentenced to life imprisonment. The prosecutor remarked that defendant would potentially be able to do the following while in prison: visit with his mother and sisters, eat his meals and drink his coffee, watch the sun rise, exercise, watch television, read, draw, receive an education, and enjoy the fresh air. Defendant contends these remarks were grossly improper because they were irrelevant and stated facts outside the record.

"[I]t is not improper for the State to argue that 'the defendant deserved the penalty of death rather than a comfortable life in prison.' " *State v. Forte*, 360 N.C. 427, 443, 629 S.E.2d 137, 148 (quoting *State v. Alston*, 341 N.C. 198, 252, 461 S.E.2d 687, 717 (1995), *cert. denied*, 516 U.S. 1148 (1996)), *cert. denied*, —— U.S. ——, 127 S. Ct. 557 (2006). This Court has previously determined that remarks similar to those made by the prosecutor here did not rise to the level of gross impropriety, even when the remarks referenced facts outside the record. *See, e.g., State v. May*, 354 N.C. 172, 179, 552 S.E.2d 151, 156 (2001) (holding trial court did not err by failing to intervene *ex mero motu* when state referenced the defendant playing cards, punching a punching bag, having a snack, watching television, and listening to the radio while in prison, even though these facts were not in the record), *cert. denied*, 535 U.S. 1060 (2002); *State v. Smith*, 347 N.C. 453, 467, 496 S.E.2d 357, 365 (holding trial court did not err by failing to intervene *ex mero motu* when state argued the defendant would spend his time in prison "comfortably doing things such as playing basketball, lifting weights, and watching television"), *cert. denied*, 525 U.S. 845 (1998); *State v. Reeves*, 337 N.C. 700, 732, 448 S.E.2d 802, 817 (1994) (holding that state's remarks that the defendant would have a " 'cozy little prison cell . . . with [a] television set, air conditioning and three meals a day' " were not so egregious as to require the trial court to intervene *ex mero motu*, even if these facts were not in the record), *cert. denied*, 514 U.S. 1114 (1995). Similarly, in the present case, "[w]hile the prosecutor improperly argued facts not in the record, the trial court still did not abuse its discretion by failing to intervene *ex mero motu*." *See May*, 354 N.C. at 179, 552 S.E.2d at 156.

**[23]** Defendant next argues the trial court committed plain error by failing to give peremptory instructions on three statutory mitigating circumstances: (1) the murder "was committed while the defendant was under the influence of mental or emotional disturbance," N.C.G.S. § 15A-2000(f)(2) (2007); (2) defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," N.C.G.S. § 15A-2000(f)(6) (2007); and, (3) defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7) (2007). The trial court instructed on each of these mitigating circumstances without a peremptory instruction and submitted all three to the jury. One or more jurors found the (f)(2) and (f)(6) mitigating circumstances, but no juror found the (f)(7) mitigating circumstance.

**STATE v. TAYLOR**

[362 N.C. 514 (2008)]

" 'If requested, a trial court should give a peremptory instruction for any statutory or nonstatutory mitigating circumstance that is supported by uncontroverted and manifestly credible evidence.' " *Forte,* 360 N.C. at 440, 629 S.E.2d at 146 (quoting *State v. Bishop,* 343 N.C. 518, 557, 472 S.E.2d 842, 863 (1996), *cert. denied,* 519 U.S. 1097 (1997)). To be entitled to a peremptory instruction, however, the defendant must timely request it. *State v. Gregory,* 340 N.C. 365, 415, 459 S.E.2d 638, 667 (1995) (citing *State v. Johnson,* 298 N.C. 47, 77, 257 S.E.2d 597, 618-19 (1979), *overruled in part on other grounds by State v. Williams,* 339 N.C. 1, 452 S.E.2d 245 (1994), *cert. denied,* 516 U.S. 833 (1995), *and overruled on other grounds by State v. Warren,* 347 N.C. 309, 492 S.E.2d 609 (1997), *cert. denied,* 523 U.S. 1109 (1998)), *cert. denied,* 517 U.S. 1108 (1996). "The trial court is not required to determine on its own which mitigating circumstances are deserving of a peremptory instruction." *Id.* at 415-16, 459 S.E.2d at 667 (citing *Johnson,* 298 N.C. at 77, 257 S.E.2d at 618-19); *see also Skipper,* 337 N.C. at 41, 446 S.E.2d at 274 ("As defendant did not request that peremptory instructions be given for any other circumstances, the trial court did not err in not giving such instructions.").

The record reveals and defendant concedes that defendant did not request a peremptory instruction on any of the three submitted statutory mitigating circumstances. Consequently, the trial court did not err in failing to give the peremptory instructions.

[24] Defendant next contends the trial court erred by sustaining the state's objections to defense counsel's closing argument regarding the types of murders for which the death penalty is most appropriate. According to defendant, the trial court improperly restricted him from arguing that the facts of his case did not warrant a death sentence and that his crime was not "the worst of the worst." *See Kansas v. Marsh,* 548 U.S. 163, 206 (2006) (Souter, J., dissenting).

During closing argument, defense counsel urged the jurors to consider the types of things that come to mind when they think about a death penalty case. Counsel first gave as examples, "Dennis Rader, who is a serial killer," "Eric Rudolph, the bomber," and "Scott Peterson[,] who killed his wife and unborn daughter." Counsel next referred to murders involving children, at which point the state objected and the trial court sustained the objection. Defense counsel then added, "Murder of the elderly, murder of the handicapped, torture." The state again objected, but defense counsel continued, "Rape or sexual offense, trophy killings, serial killings, using

bombs or weapons of mass destruction, someone who gets an enjoyment or thrill out of killing, someone who kills someone in their own family." At this point the state objected for a third time, and the trial court sustained the objection and allowed the state's motion to strike.

"Control of the jury argument [is] within the sound discretion of the trial court." *Braxton*, 352 N.C. at 221, 531 S.E.2d at 465. Furthermore, " '[u]pon objection, the trial court has the duty to censor remarks not warranted by the evidence or law.' " *State v. Wilson*, 335 N.C. 220, 225, 436 S.E.2d 831, 834 (1993) (quoting *State v. Anderson*, 322 N.C. 22, 37, 366 S.E.2d 459, 468, *cert. denied*, 488 U.S. 975 (1988)). A defendant may not "make comparisons between cases and the facts of each case" in which a determination favorable to a defendant was made, *State v. McNeill*, 360 N.C. 231, 248, 624 S.E.2d 329, 340, *cert. denied*, —— U.S. ——, 127 S. Ct. 396 (2006), because: (1) "[t]he facts of the other cases are not pertinent" to a jury's consideration of evidence presented in a particular case, *Braxton*, 352 N.C. at 222, 531 S.E.2d at 465; and (2) "the circumstances of other murders, either actual or imagined," are often "not present in the record at the time of closing arguments," *McNeill*, 360 N.C. at 248, 624 S.E.2d at 341. *See also* N.C.G.S. § 15A-1230(a) (2007) ("During a closing argument to the jury an attorney may not . . . make arguments on the basis of matters outside the record . . . ."). In *State v. McNeill*, this Court held the trial court did not err in sustaining the state's objections to these remarks by defense counsel during closing argument: "[W]hat would be some examples of murders that would be worse [than the murder committed by defendant]?" and, "[W]hat [defendant] did is not the worst first degree murder. And it has not been committed by the worst defendant." 360 N.C. at 247-48, 624 S.E.2d at 340-41.

Here, defense counsel engaged in far more specific comparisons than did the defense counsel in *McNeill*. Defense counsel listed several specific murderers and several general types of murder with which he urged the jury to compare the instant murder. The trial court sustained objections to only some of these comparisons. Moreover, defendant was not prohibited from arguing that the circumstances of his case—regardless of the circumstances of other cases—did not warrant imposition of the death penalty. For these reasons, we cannot say the trial court abused its discretion in sustaining the state's objections.

STATE v. TAYLOR

[362 N.C. 514 (2008)]

## PRESERVATION ISSUES

Defendant raises additional issues that have previously been decided by this Court contrary to his position: (1) whether the trial court properly denied defendant's motion for a bill of particulars; (2) whether the trial court properly overruled defendant's objection to the state's closing argument that the jury is the community's voice; (3) whether the short-form indictment was sufficient to charge first-degree murder; (4) whether the trial court properly denied defendant's motion to strike the death penalty from consideration as violative of defendant's federal and state constitutional rights; (5) whether the trial court properly denied defendant's motion objecting to the use of the pecuniary gain aggravating circumstance on the ground that the wording of the pecuniary gain statute is unconstitutionally vague; (6) whether the trial court properly denied defendant's motion to prohibit death qualification of the jury; (7) whether the trial court properly denied defendant's motion for separate juries for the two phases of his trial; (8) whether the trial court's instructions on Issue Three were vague or confusing; (9) whether the trial court's instruction that at Issues Three and Four each juror may consider the mitigating circumstances found by that juror, rather than any mitigating circumstance found by any juror, was proper; (10) whether the trial court's instruction that at Issue Three each juror may, rather than must, consider the mitigating circumstances found by that juror was proper; and (11) whether the trial court's instruction that the jury must be unanimous to answer "No" to Issues One, Three, and Four was proper. We have considered defendant's contentions on these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject defendant's arguments.

## PROPORTIONALITY REVIEW

[25] Finally, we undertake our statutory duty to determine: (1) whether the record supports the aggravating circumstances found by the jury; (2) whether the death sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factor"; and (3) whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2007).

Defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury found both aggravating circumstances submitted to exist: (1) the murder was "committed for pecuniary gain," § 15A-2000(e)(6);

STATE v. TAYLOR

[362 N.C. 514 (2008)]

and (2) the murder was "part of a course of conduct in which the defendant engaged" and which included defendant's commission of "other crimes of violence against another person or persons," § 15A-2000(e)(11).

The jury found two statutory mitigating circumstances to exist: (1) the murder was committed "while the defendant was under the influence of mental or emotional disturbance," § 15A-2000(f)(2); and (2) defendant's capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," § 15A-2000(f)(6). The jury also found the statutory catchall mitigating circumstance to exist and have mitigating value, § 15A-2000(f)(9). Additionally, the jury found thirty of thirty-two submitted nonstatutory mitigating circumstances to exist and have mitigating value. These related generally to the circumstances of the crime and defendant's cooperation with law enforcement, defendant's impoverished upbringing and neglectful parents, and defendant's mental health problems.

Having thoroughly reviewed the record, transcript, briefs, and oral arguments in this case, we conclude that the record fully supports the aggravating circumstances found by the jury. Further, there is no evidence that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We therefore turn to our duty of proportionality review.

**[26]** At the outset, we reiterate that this Court accords great deference to a jury's sentencing recommendation and will declare a death sentence disproportionate " '[o]nly in the most clear and extraordinary situations.' " *State v. Raines*, 362 N.C. 1, 25, 653 S.E.2d 126, 142 (2007) (quoting *State v. Chandler*, 342 N.C. 742, 764, 467 S.E.2d 636, 648, *cert. denied*, 519 U.S. 875 (1996)). We will not "substitute our own notions as to the appropriateness of the penalty of death in a given case for those of the jury." *Chandler*, 342 N.C. at 764, 467 S.E.2d at 648.

Instead of replicating the function of the jury in a given case, our purpose is " 'to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *State v. Badgett*, 361 N.C. 234, 263, 644 S.E.2d 206, 223 (quoting *State v. Hyatt*, 355 N.C. 642, 670, 566 S.E.2d 61, 79 (2002), *cert. denied*, 537 U.S. 1133 (2003)), *cert. denied*, —— U.S. ——, 128 S. Ct. 502 (2007). Thus, in conducting our proportionality review, we consider whether, under the " 'totality of the circumstances,' " *State v. Kemmerlin*, 356 N.C. 446, 489, 573

S.E.2d 870, 898 (2002) (quoting *State v. Bondurant*, 309 N.C. 674, 694 n.1, 309 S.E.2d 170, 183 n.1 (1983)), the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," § 15A-2000(d)(2). Similarity, however, "merely serves as an initial point of inquiry" and "is not the last word on the subject of proportionality." *State v. Watts*, 357 N.C. 366, 381, 584 S.E.2d 740, 751 (2003) (citations and internal quotation marks omitted), *cert. denied*, 541 U.S. 944 (2004). Rather, a determination of whether the death penalty is disproportionate in a given case " 'ultimately rest[s] upon the experienced judgments of the members of this Court.' " *McNeill*, 360 N.C. at 253, 624 S.E.2d at 344 (quoting *State v. Garcia*, 358 N.C. 382, 426, 597 S.E.2d 724, 754 (2004) (alteration in original) (internal quotation marks omitted), *cert. denied*, 543 U.S. 1156 (2005)); *accord Raines*, 362 N.C. at 25, 653 S.E.2d at 142; *State v. Cummings*, 361 N.C. 438, 478, 648 S.E.2d 788, 812 (2007), *cert. denied*, —— U.S. ——, 128 S. Ct. 1888 (2008).

We begin by observing that several characteristics of both defendant's crime and defendant's conduct have been cited routinely by this Court as supporting a determination that a death sentence is not disproportionate. First, defendant was convicted of first-degree murder both on the basis of premeditation and deliberation and under the felony murder rule. Although a death sentence may properly be imposed for convictions based solely on felony murder, *see, e.g., Chandler*, 342 N.C. at 747, 754, 764, 467 S.E.2d at 639, 643, 648-49; *State v. Williams*, 305 N.C. 656, 660, 682, 691, 292 S.E.2d 243, 247, 259, 263-64, *cert. denied*, 459 U.S. 1056 (1982), "a finding of premeditation and deliberation indicates a more calculated and cold-blooded crime" for which the death penalty is more often appropriate, *see, e.g., Badgett*, 361 N.C. at 263, 644 S.E.2d at 223 (internal quotation marks omitted) (quoting *Hyatt*, 355 N.C. at 670, 566 S.E.2d at 79).

Additionally, the jury in this case found that the murder was part of a course of conduct that included other violent crimes, specifically, defendant's robbery with a dangerous weapon of Mrs. Butts and attempted robbery with a dangerous weapon of Mr. Butts, and that the murder was committed for pecuniary gain. " 'The course of conduct circumstance is often present in cases where the jury imposes death instead of life imprisonment.' " *State v. Guevara*, 349 N.C. 243, 263, 506 S.E.2d 711, 724 (1998) (quoting *State v. Miller*, 339 N.C. 663, 694, 455 S.E.2d 137, 154, *cert. denied*, 516 U.S. 893 (1995)), *cert. denied*, 526 U.S. 1133 (1999). Furthermore, this Court has held the course of conduct circumstance, standing alone, *see State v.*

*Hoffman,* 349 N.C. 167, 194, 505 S.E.2d 80, 96 (1998), *cert. denied,* 526 U.S. 1053 (1999), and the pecuniary gain circumstance, standing alone, *Chandler,* 342 N.C. at 760, 764, 467 S.E.2d at 646, 649; *State v. Ward,* 338 N.C. 64, 124, 129, 449 S.E.2d 709, 743, 746 (1994), *cert. denied,* 514 U.S. 1134 (1995), sufficient to sustain a sentence of death.

Finally, there is no evidence that defendant demonstrated remorse for the murder. This Court has frequently highlighted a defendant's display of remorse or lack thereof as a relevant consideration in proportionality review. *See, e.g., State v. Goss,* 361 N.C. 610, 630, 651 S.E.2d 867, 879 (2007) (noting defendant "failed to show any immediate remorse for the murder"), *cert. denied,* —— U.S. ——, 129 S. Ct. 59 (2008); *State v. Elliot,* 360 N.C. 400, 426, 628 S.E.2d 735, 752 (noting "defendant certainly has not shown any remorse for his actions"), *cert. denied,* —— U.S. ——, 127 S. Ct. 505 (2006); *State v. Robinson,* 355 N.C. 320, 345, 561 S.E.2d 245, 261 (noting "[d]efendant showed no remorse when telling his accomplice and others what happened after having shot and killed the victim"), *cert. denied,* 537 U.S. 1006 (2002); *see also Bondurant,* 309 N.C. at 694, 309 S.E.2d at 182 (emphasizing, in determining death sentence to be disproportionate, that defendant, immediately after shooting the victim, "exhibited a concern for [the victim's] life and remorse for his action" by accompanying the victim to the hospital).

In the instant case, defendant drove his injured accomplice to the hospital, but did not offer aid to or seek medical assistance for the victim. Instead, upon arrival at the hospital, defendant attempted to conceal the location of the shooting, and he twice told law enforcement officers that he stayed in the car during the robbery. Only after officers viewed a recording of the robbery captured by the surveillance camera at Mitch's Grocery did defendant confess to entering the store and firing his weapon. *See State v. Harris,* 338 N.C. 129, 153-54, 449 S.E.2d 371, 382-83 (1994) (noting that "no member of the jury found mitigating value in the defendant's purported remorse," perhaps because "[w]hile the defendant surrendered himself to the authorities and cooperated fully, he did so . . . only after being informed that the victim, prior to his death, had identified the defendant by name and that police were looking for him"), *cert. denied,* 514 U.S. 1100 (1995). Shortly after the murder, while defendant was incarcerated, he placed a call that was recorded and played for the jury at trial. During this ten-minute call, defendant expressed no remorse for his actions, even when the person with whom he was speaking informed him that the store owner had died at the hospital.

Finally, there is no evidence that defendant demonstrated a sense of remorse at trial.

We next compare the present case with other cases in which this Court has ruled on the proportionality issue. *See Badgett,* 361 N.C. at 263, 644 S.E.2d at 223.

We first consider whether the present case is substantially similar to any of the eight cases in which this Court held that the death penalty was disproportionate. *See Kemmerlin,* 356 N.C. at 489, 573 S.E.2d at 898; *State v. Benson,* 323 N.C. 318, 328, 372 S.E.2d 517, 522 (1988); *State v. Stokes,* 319 N.C. 1, 27, 352 S.E.2d 653, 668 (1987); *State v. Rogers,* 316 N.C. 203, 237, 341 S.E.2d 713, 733 (1986), *overruled in part on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988), *and by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900 (1997); *State v. Young,* 312 N.C. 669, 691, 325 S.E.2d 181, 194 (1985); *State v. Hill,* 311 N.C. 465, 479, 319 S.E.2d 163, 172 (1984); *Bondurant,* 309 N.C. at 694, 309 S.E.2d at 183; *State v. Jackson,* 309 N.C. 26, 46, 305 S.E.2d 703, 717 (1983). Defendant contends the instant case is particularly similar to *State v. Benson* and *State v. Stokes.*

In *Benson,* the defendant planned to rob the victim, a restaurant manager, while the victim was depositing the day's receipts at the bank. 323 N.C. at 320-21, 372 S.E.2d at 518. As the victim approached the night deposit box with his moneybag, the defendant, who had been hiding in the bushes, demanded the money and shot the victim in the legs. *Id.* at 321, 372 S.E.2d at 518. He then grabbed the moneybag and fled the scene, leaving the victim to die from blood loss. *Id. Benson* is distinguishable from the present case in the following significant respects: the defendant in *Benson* pled guilty to first-degree murder under the felony murder rule only, 323 N.C. at 320, 372 S.E.2d at 518, while defendant in the present case was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule; the jury in *Benson* found only one aggravating circumstance, that the murder was committed for pecuniary gain, *id.* at 328, 372 S.E.2d at 522, while the jury in the present case found the course of conduct aggravating circumstance in addition to the pecuniary gain aggravating circumstance; and the defendant in *Benson* "pleaded guilty during the trial and acknowledged his wrongdoing before the jury," *id.* at 328, 372 S.E.2d at 523, while defendant in the present case failed to show remorse for his crime or otherwise acknowledge his wrongdoing before the jury.

In *Stokes*, the defendant and several accomplices beat the victim to death while robbing his warehouse. 319 N.C. at 3, 352 S.E.2d at 654. *Stokes* is distinguishable from the present case in the following significant respects: the defendant in *Stokes* was convicted of first-degree murder under the felony murder rule only, *id.* at 4, 352 S.E.2d at 654, while defendant in the present case was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule; and the defendant in *Stokes* was seventeen years old at the time of the crime, *id.* at 21, 352 S.E.2d at 664, while defendant in the present case was twenty-one years old. Furthermore, in determining the death sentence was disproportionate in *Stokes*, this Court emphasized that the defendant was "not . . . more deserving of death" than his accomplice, who received a sentence of life imprisonment for committing "the same crime in the same manner" as the defendant. *Id.* at 20-21, 352 S.E.2d at 664. No such situation is present here.

We have also compared the instant case with the other six cases in which this Court determined the death penalty was disproportionate and conclude that it is not substantially similar to any of those cases. Instead, each of those cases may be distinguished not only by its general facts, but also by one or more notable characteristics not present in the instant case. In *State v. Kemmerlin*, the defendant had been subjected to physical and emotional abuse by the victim; the defendant's accomplice, who performed the act of killing the victim, received a sentence of life imprisonment; and the jury found only one aggravating circumstance, the pecuniary gain circumstance, which was supported by weak evidence. 356 N.C. at 451-55, 488-89, 573 S.E.2d at 877-79, 898. In *State v. Rogers*, the defendant mistakenly shot the victim while attempting to shoot someone else, and the defendant's accomplice was sentenced to life imprisonment. 316 N.C. at 211-12, 341 S.E.2d at 718-19. In *State v. Young*, the defendant was nineteen years old at the time of the murder, and the jury did not find the course of conduct aggravating circumstance. 312 N.C. at 686, 688, 325 S.E.2d at 192-93. In *State v. Hill*, the evidence surrounding the murder was "somewhat speculative," there was no evidence of any motive for the murder, and the murder was not part of a violent course of conduct by the defendant. 311 N.C. at 478-79, 319 S.E.2d at 171-72. In *State v. Bondurant*, the defendant demonstrated a sense of remorse immediately after fatally shooting the victim and accompanied the victim to the hospital to seek medical assistance. 309 N.C. at 694, 309 S.E.2d at 182. Finally, in *State v. Jackson*, the defendant was convicted only under the felony murder rule, and there was a general

lack of evidence concerning the details of the murder. 309 N.C. at 43, 46, 305 S.E.2d at 715, 717.

Although we could selectively extrapolate discrete similarities between the instant case and some of those cases in which this Court has held the death sentence disproportionate, our review reveals that, "considering both the crime and the defendant," § 15A-2000(d)(2), the instant case is more factually similar to cases in which this Court has held the death sentence not disproportionate. In particular, we have reviewed several cases that share the following features with the present case: the defendant fatally shot an attendant during the perpetration of an armed robbery of a small business; there was no evidence indicating the defendant, at the time he entered the store, planned to kill the attendant; and the defendant was convicted of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule.

For example, in *State v. Robinson*, the defendant and an accomplice planned to rob a Pizza Inn and gathered clothes and weapons to use during the robbery. 355 N.C. at 325, 561 S.E.2d at 249. Later in the evening, with weapons drawn and faces covered, the two entered the store and approached the cash register. *Id.* The defendant pointed his weapon at the store manager and demanded money. *Id.* When the manager replied, "What are you going to do if I don't?" the defendant fired his weapon at the floor. *Id.* Then, when the manager moved forward, the defendant shot him in the head and fled with his accomplice. 355 N.C. at 325-26, 561 S.E.2d at 249. The defendant was convicted of first-degree murder and sentenced to death, and this Court determined that the death sentence was not disproportionate. *Id.* at 325, 345, 561 S.E.2d at 249, 261.

In *State v. Hoffman*, the defendant entered a jewelry store wearing a ski mask and carrying a gun. 349 N.C. at 173, 505 S.E.2d at 84. The defendant shot the victim, who was standing behind the store's display counter, broke three glass display cases, and took various items of jewelry. *Id.* Again, this Court upheld the first-degree murder conviction and the death sentence. 349 N.C. at 195, 505 S.E.2d at 97.

In another similar case, *State v. Cummings*, 346 N.C. 291, 488 S.E.2d 550 (1997), *cert. denied*, 522 U.S. 1092 (1998), the defendant decided to rob a certain convenience store after observing that the store " 'looked easy to rob' " because an "old man" was running it by himself. *Id.* at 302, 488 S.E.2d at 557. Evidence suggested that when the defendant entered the store and demanded money, the attendant

STATE v. TAYLOR

[362 N.C. 514 (2008)]

attempted in some manner to protect himself and his property with a gun he kept behind the cash register. *Id.* at 300, 302, 488 S.E.2d at 556-57. The defendant shot the attendant two times, killing him. *Id.* at 303, 488 S.E.2d at 557. The defendant then took money from the cash register and left the store. *Id.* at 302, 488 S.E.2d at 557. As he was leaving, he fired an additional shot in an attempt to scare the victim's wife, who, upon hearing gunshots, had run outside her house, located fifty feet from the store. *Id.* at 299-300, 488 S.E.2d at 555. At trial, the defendant was convicted of first-degree murder and sentenced to death. *Id.* at 300, 488 S.E.2d at 555. This Court concluded that the death sentence was not disproportionate. *Id.* at 335, 488 S.E.2d at 576.

*Cummings* is also similar to the present case with respect to several specific characteristics of the crime and the defendant's conduct. With regard to the crime itself, the jury in *Cummings* found that the murder was committed for pecuniary gain and that the murder was part of a course of conduct including other violent crimes. *Id.* at 333, 488 S.E.2d at 575. The jury in the present case found the same two aggravating circumstances. With regard to the defendant's conduct, the defendant in *Cummings* initially told law enforcement officers that he remained outside while the robbery and shooting occurred, and only later confessed to the version of the story outlined above. *Id.* at 302, 488 S.E.2d at 556-57. Likewise, in the present case, defendant twice told law enforcement officers that he remained in the car during the robbery of Mitch's Grocery, and only in his third statement confessed to being inside the store and firing his weapon. Furthermore, in both *Cummings* and the present case, the jury recommended a sentence of death despite finding a significant number of mitigating circumstances—twenty-eight of the thirty-two submitted in *Cummings, id.* at 334, 488 S.E.2d at 576, and thirty-three of the thirty-six submitted in the present case. *See also State v. Thompson*, 359 N.C. 77, 82-85, 130-31, 604 S.E.2d 850, 857-59, 885-86 (2004) (holding death sentence not disproportionate when the defendant, in the course of robbing a Domino's Pizza, fatally shot the store manager two times and set fire to the building to cover up his crime), *cert. denied*, 546 U.S. 830 (2005); *State v. Larry*, 345 N.C. 497, 507, 534, 481 S.E.2d 907, 913, 929 (holding death sentence not disproportionate when the defendant, after pointing a gun at a Food Lion employee and taking money from the safe, fatally shot a store customer who was also an off-duty police officer when the officer chased him outside and struggled with him on the ground), *cert. denied*, 522 U.S. 917 (1997).

For all of the foregoing reasons, we conclude that the death sentence is not excessive or disproportionate in this case.

In sum, we hold that defendant received a fair trial and capital sentencing proceeding free from prejudicial error. Consequently, the trial court's judgment and sentence of death remain undisturbed.

NO ERROR.