An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-948

Filed 1 October 2025

Columbus County, Nos. 21CRS052533-230, 21CRS052534-230

STATE OF NORTH CAROLINA

       v.

TYQUISE BAKER, Defendant.

Appeal by defendant from judgment entered 8 September 2023 by Judge Richard Kent Harrell in Columbus County Superior Court. Heard in the Court of Appeals 26 August 2025.

> *Stephen G. Driggers, for defendant-appellant.*
>
> *Attorney General Jeff Jackson, by Associate Deputy Attorney General Daniel P. Mosteller, for the State.*

FLOOD, Judge.

Defendant Tyquise Baker appeals from the trial court's judgment entered on a jury's verdict finding him guilty of first degree murder and assault with a deadly weapon inflicting serious injury. On appeal, Defendant argues the trial court: first, erred by denying his motion to dismiss the first degree murder charge where there was insufficient evidence of premeditation and deliberation, and second, abused its

discretion in allowing the State, in rebuttal, to introduce the recording of Defendant's statements to detectives from the hospital. Upon careful review, we hold the trial court did not err in denying Defendant's motion to dismiss where the State presented substantial evidence of premeditation and deliberation through witness testimony, such that it was for the jury to decide. We dismiss Defendant's second argument regarding rebuttal evidence for lack of preservation as Defendant failed to file a motion to suppress.

## I. **Factual and Procedural Background**

On 14 September 2021, Defendant drove to visit Sean Frazier, who was "like an uncle" to Defendant; Defendant planned to repair a water leak and replace a headlight during his visit. Fraizer lived at 545 Dessie Road in Columbus County, North Carolina, and his house was known in the community as a "drug house."

That same evening, Teonacah Evans, her brother Larry Evans ("LJ"), Julius Miller, and Steven Barfield rode in Barfield's Honda Accord to Frazier's house "to go buy some weed." Miller brought along two rifles, one of which was an AR style 5.56mm semi-automatic. There is conflicting testimony as to whether a man named Rameek Freeman was with this group, arrived separately, or arrived at Frazier's house at all.

Once the group arrived at Frazier's house, they noticed five or six cars parked by the house and a few people standing outside, including Defendant. Miller exited the Honda, carrying the AR 5.56mm rifle, and walked up to Defendant with Evans

by Miller's side. Testimony is conflicting after this point as to the events that occurred after Evans, Miller, LJ, and Barfield exited the vehicle.

According to Evans, as she and Miller walked up to Defendant, Defendant asked Miller: "Why do you have a gun on you?" Miller responded: "What do you mean? Every time you see me, I have a gun on me." Evans testified Miller had his rifle "[p]ointing at the ground" during this conversation, and when Miller turned his back on Defendant, Defendant "pulled out his gun and started shooting" and "shot [Miller,]" then Miller fell "instantly" and was killed. Evans then claimed Defendant "look[ed] at me, and it[ was] like the bullet came out in slow motion and hit me in my arm. I didn't know I was hit in my stomach, but I knew I was hit in my arm[.]" Evans was ultimately shot three times—"right on [her] shoulder," "in [her] stomach[,]" and a graze on her arm. Evans ran to the Honda, got in the back, and then climbed into the driver's seat and drove to her mother's house without checking for anybody because she "felt like [she] was fixin' to die." Evans testified Freeman was not at the scene**.**

According to Defendant, however, after arriving at the house, LJ, Freeman, and Barfield "walked around" him while Evans and Miller "walked up to [him]." Defendant stated Miller "had [the rifle] pointed down when they was [sic] walking up, and then he walked right to me and put it on me." Defendant testified he exclaimed: "Bro, what you doing out here with that gun? What you got going on out here with that gun?" Miller replied: "Anywhere I go, you going to see me with my

gun." He then "clicked it[,]" and said, "You know what time it is." Defendant testified "[w]hen [Miller] clicked it . . . Freeman . . . start[ed] shooting." In response to Freeman's shooting, according to Defendant: "I went in my waistband, I had a 9-millimeter Ruger . . . and I just start shooting . . . I started running back shooting backwards, boom-boom-boom[.]" Defendant was shot in the "back two times." He stated he "was just shooting[,]" trying to "sho[ot his] way back in the house[.]" Defendant explained he must have dropped his gun, because when he "ran in the house, [Frazier] said I didn't have no gun in my hand[.]"

Kloey Nance, a witness to the events, testified she saw eight or more cars in Frazier's driveway that evening and about ten people outside. Nance testified she saw Evans, Barfield, LJ, and Freeman get out of a car, but could not "recall" if Miller was with them. Nance and Frazier's daughter, Tiny Frazier, were talking in Nance's car by the road when they heard gunshots. Nance testified she heard "a couple shots, but then it sounded like a whole 'nother different, like, couple shots, like, two different guns, maybe, but [she] d[idn't] know." Nance began driving away when Barfield "pulled on the back door and got in the back of the car[,]" and Nance drove him to his aunt's house.

When law enforcement responded to Frazier's house, they found, among other things, Miller's deceased body, Miller's AR 5.56mm rifle, a rifle magazine, and 9-millimeter shell casings. Law enforcement analysis of these casings determined two different 9-millimeter guns had fired the shots, with a single Glock-type firearm firing

ten of them. None of the casings matched Miller's AR 5.56mm rifle, and no 9-millimeter guns were found as part of the investigation.

On 15 September 2021, the day after the shooting, Detectives Adam Sellers and Jeremy Barber interviewed Defendant after his surgery. Defendant later testified at trial that during this hospital interview, he told the detectives: "A car pulled up, people started shooting at me[,]" but "I can't tell you who shot me" because Defendant's lawyer had told him not to talk to the police. Defendant further testified he "probably did" talk to officers at the hospital, but he "couldn't remember" because he "was sedated then[.]" Defendant remained in intensive care for twenty-three days.

On 8 December 2021, Defendant was indicted with the first degree murder of Miller, and assault with a deadly weapon inflicting serious injury against Evans.

At trial, Dr. Paul Yell, Associate Chief Medical Examiner, testified Miller had died from "multiple gunshot wounds[.]" Yell explained Miller's body had sixteen entrance wounds and thirteen exit wounds, most of which were to Miller's back, with a few of the back wounds showing signs that Miller had been shot from "six inches to about three or four feet away." Yell could not, however, determine the order in which the bullets hit Miller. The bullet remnants in Miller's body were consistent "with handgun bullets[,]" but they were too deformed to determine their caliber or the specific gun that shot them.

Firearms examiner Brooke Layne testified the shell casings found at the scene were fired from two different handguns: Cartridge casings identified as Q1 through

Q10 were fired from the same gun, while casings identified as Q11 through Q18 were fired from another gun.

During rebuttal, the State sought to introduce an audio recording of Defendant's conversation with the detectives at the hospital. Defendant's counsel objected to the introduction of the hospital recording, emphasizing Defendant had just gotten out of surgery before the detectives saw him and had already acknowledged the conversation during his testimony. The trial court overruled the objection. Also during the State's rebuttal, Detective Sellers testified he and his partner had "advised [Defendant] who we were, what we were there for, to speak with him, and gave him the option to speak with us, and he did." Although Detective Sellers admitted he could not attest to Defendant's coherence during the interview because "[he is] not a doctor," he recounted that Defendant's "words were clear" during the interview.

At the close of the State's evidence and at the close of all evidence, Defendant moved to dismiss the first degree murder charge. The trial court denied the motion each time explaining sufficient evidence had been presented to the jury, and "the issue of credibility of the witness is for the jury to determine, not the Court." Similarly, during the charge conference, the trial court observed: "We've got two completely different versions of the same event. The jury is going to have to determine who they find to be credible."

Using language from the pattern first degree murder instruction, the trial

court instructed the jury that it needed to find premeditation and deliberation to return a guilty verdict on first degree murder. The court also instructed the jury on self defense for all the charges.

The jury returned guilty verdicts against Defendant, finding him guilty of the first degree murder of Miller, and guilty of assault with a deadly weapon inflicting serious injury against Evans. The trial court sentenced Defendant to life without parole for first degree murder and 33-to-52 months of incarceration for assault with a deadly weapon inflicting serious injury. Defendant timely appealed.

## II. Jurisdiction

This Court has jurisdiction to review this appeal from a final judgment of a superior court, pursuant to N.C.G.S. §§ 7A-27(b)(1) and 15A-1444(a) (2023).

## III. Analysis

On appeal, Defendant argues the trial court (A) erred by denying his motion to dismiss the first degree murder charge where there was insufficient evidence of premeditation and deliberation, and (B) abused its discretion in allowing the State, in rebuttal, to introduce the recording of Defendant's statements to detectives from the hospital. We address each argument in turn.

### A. Premeditation and Deliberation

Defendant first argues the trial court erred by denying his motion to dismiss the first degree murder charge. Specifically, Defendant contends the State did not produce sufficient evidence of premeditation and deliberation as required for first

degree murder. We disagree.

"We review the trial court's denial of a motion to dismiss *de novo*." *State v. Summey*, 228 N.C. App. 730, 733 (2013) (citation omitted). In reviewing, we must determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of [the] defendant's being the perpetrator of such offense." *State v. Fritsch*, 351 N.C. 373, 378 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78–79 (1980) (citations omitted). "The [c]ourt must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from that evidence[,]" and "[c]ontradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve." *State v. Horskins*, 228 N.C. App. 217, 220 (2013). Additionally, it is the jury's role to "assess witness credibility." *State v. McCutcheon*, 281 N.C. App. 149, 153 (2021) (citation omitted).

"Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation." *Horksins*, 228 N.C. App. at 221 (citation omitted). "Premeditation means that the act was thought over beforehand for some length of time, however short[,]" and "[d]eliberation means an intent to kill, carried out in a cool state of blood, . . . and not under the influence of a violent passion or a sufficient legal provocation." *State v. Taylor*, 362 N.C. 514, 531 (2008) (citation omitted). "The phrase 'cool state of blood' means that the defendant's anger or

emotion must not have been such as to overcome the defendant's reason." *State v. Elliott*, 344 N.C. 242, 267 (1996) (citation omitted). "Because premeditation and deliberation are ordinarily not susceptible to proof by direct evidence, they are most often proved by circumstantial evidence." *Taylor*, 362 N.C. at 531.

Our Supreme Court has "identified certain conduct on the part of a defendant before, during, and after a murder that supports an inference of premeditation and deliberation[,]" including the following:

> (1) entering the site of the murder with a weapon, which indicates the defendant anticipated a confrontation and was prepared to use deadly force to resolve it, (2) firing multiple shots, because some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger, (3) pausing between shots, and (4) attempting to cover up involvement in the crime.

*Id.* at 531 (citation modified). Additional factors to consider include "the nature and number of the victim's wounds," whether the defendant "left the deceased to die without attempting to obtain assistance for the deceased," whether the defendant "disposed of the murder weapon," "whether the defendant later lied about what happened[,]" "[t]hreats and declarations of [the] defendant before and during the course of the occurrence giving rise to the death of deceased[,]" and "[t]he dealing of lethal blows after deceased has been felled and rendered helpless." *Horskins*, 228 N.C. App. at 222 (citations omitted). "In analyzing premeditation and deliberation, courts look to the totality of the circumstances rather than a single factor." *State v. Walker*, 286 N.C. App. 438, 442 (2022) (citation omitted).

Defendant relies on *State v. Hague*, 295 N.C. App. 380 (2024), *State v. Corn*, 303 N.C. 293 (1981), and *State v. Williams*, 144 N.C. App. 526 (2001) to argue there was insufficient evidence of premeditation and deliberation presented by the State. Defendant's reliance is misplaced.

In *Hague*, this Court reversed the defendant's conviction of first degree murder for lack of sufficient evidence of premeditation and deliberation where the evidence showed "[the victim] provoked [the d]efendant, an injured 72-year-old man, by yelling at him and pushing him to the ground," and "the evidence further demonstrated that it had been [the d]efendant's 'habit' since serving in the Vietnam war to carry his gun when leaving the house." 295 N.C. App. at 391. Additionally this Court considered the following evidence: "[the d]efendant did not threaten [the victim] before or during their interaction leading to the shooting"; "[the victim] was shot once"; "[the d]efendant did not deal additional lethal blows after [the victim] had fallen to the ground"; "[the d]efendant left the scene to call law enforcement although aware that others present were also calling for assistance"; "[the d]efendant did not dispose of his gun, rather he unloaded it, placed it on the picnic table and directed law enforcement to it upon their arrival"; and "[a]lthough the witnesses' testimony conflicted at trial, [the d]efendant's statements in his 911 call were consistent with his testimony at trial" and the defendant did not "attempt to lie about killing [the victim] or conceal any facts to law enforcement." *Id.* at 391. This Court concluded that, "[u]nder the totality of the circumstances, giving equal weight to all factors, we

- 10 -

are unable to hold [the d]efendant's conduct met the threshold of premeditation and deliberation." *Id.* at 391.

In *Corn*, our Supreme Court reversed the defendant's conviction of first degree murder after the defendant had shot and killed the victim after the victim "walked over to the couch on which [the] defendant was lying, grabbed [the] defendant, and began slinging him around and attempting to hit him[,]" and "accused [the] defendant of being a homosexual." 303 N.C. at 295. The Court explained that the evidence showed:

> [The victim] entered [the] defendant's home in a highly intoxicated state, approached the sofa on which [the] defendant was lying, and insulted [the] defendant by a statement which caused [the] defendant to reply "you son-of-a-bitch, don't accuse me of that." [The d]efendant immediately jumped from the sofa, grabbing the .22 caliber rifle which he normally kept near the sofa, and shot [the victim] several times in the chest. The entire incident lasted only a few moments.

*Id.* at 297–98. Our Supreme Court reversed the conviction of first degree murder, reasoning that "[t]here [was] no evidence that [the] defendant acted in accordance with a fixed design or that he had sufficient time to weigh the consequences of his actions[,]" as the defendant "did not threaten [victim] before the incident or exhibit any conduct which would indicate that he formed any intention to kill him prior to the incident in question[,]" and "[t]here was no significant history of arguments or ill will between the parties." *Id.* at 298. Further, "[a]lthough [the] defendant shot [the victim] several times, there is no evidence that any shots were fired after he fell or

that [the] defendant dealt any blows to the body once the shooting ended[,]" and thus, "[a]ll the evidence tends to show that defendant shot [the victim] after a quarrel, in a state of passion, without aforethought or calm consideration." *Id.* at 298.

Finally, in *Williams*, this Court reversed the defendant's conviction of first degree murder for lack of premeditation and deliberation where

> there was no evidence that [the] defendant and [the victim] knew each other before the altercation at the club. There also was no evidence of animosity or that [the] defendant had made threatening remarks to [the victim]. Furthermore, the defendant was provoked by [the victim's] assault to which [the] defendant immediately retaliated by firing one shot resulting in the immediate cessation of the altercation after [the victim] fell. Finally, [the] defendant's actions before and after the shooting did not show planning or forethought on his part. After committing the crime in front of a crowd of bystanders, [the] defendant left the scene immediately but turned himself in the next day.

144 N.C. App. at 530–31.

In *Hague, Corn,* and *Williams*, the uncontested evidence shows each victim physically provoked and assaulted the defendants; the defendants either shot only once or, as in *Corn*, did not deal any blows once the victim was down; and none of the defendants lied or tried to conceal the murders. Here there is conflicting evidence as to whether Miller provoked and assaulted Defendant, whether Defendant continued to shoot Miller once he was down, and whether Defendant intentionally or unintentionally lied during his conversation with detectives at the hospital. Where it is the jury's role to "assess witness credibility[,]" *see McCutcheon*, 281 N.C. App. at

153, and where "[c]ontradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve[,]" *see Horskins*, 228 N.C. App. at 220, the trial court did not err in denying Defendant's motion to dismiss as the State presented substantial evidence through the testimony of Evans that Defendant, unprovoked, deliberately shot and killed Miller, *see Smith*, 300 N.C. at 78–79. Accordingly, we affirm the trial court's denial of Defendant's motion to dismiss.

## B. Recording of Defendant's Statements to Detectives

Defendant next argues the trial court abused its discretion in allowing the State, in rebuttal, to introduce the recording of Defendant's statements to detectives while at the hospital. Specifically, Defendant contends the trial court should not have admitted Defendant's statements where those statements were not made voluntarily. We disagree.

This Court reviews the trial court's admission of rebuttal evidence for abuse of discretion. *See* N.C.G.S. § 15A-1226(b) (2023); *see also State v. Johnston*, 344 N.C. 596, 605 (1996). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Blankenship*, 259 N.C. App. 102, 111–12 (2018).

Our statutes provide that "[e]ach party has the right to introduce rebuttal evidence concerning matters elicited in the evidence in chief of another party[,]" including "new evidence during rebuttal which could have been offered in the party's case in chief or during a previous rebuttal[.]" N.C.G.S. § 15A-1226(a) (2023). The trial

court, "in [its] discretion[,] may permit any party to introduce additional evidence at any time prior to verdict." N.C.G.S. § 15A-1226(b); *see also Johnston*, 344 N.C. at 605 ("The State has the right to introduce evidence to rebut or explain evidence elicited by [the] defendant[.]").

"In North Carolina, the legislature has statutorily specified the procedures for determining whether a defendant's statements are voluntarily made. When the prosecution seeks to use a defendant's statement in his criminal trial, the defendant may challenge the admissibility of this evidence by a motion to suppress." *State v. Johnson*, 304 N.C. 680, 683 (1982) (citation omitted). Our statutes provide a defendant "may move to suppress evidence *only* prior to trial unless the defendant did not have [a] reasonable opportunity to make the motion before trial or unless a motion to suppress is allowed during trial under subsection (b) or (c)." N.C.G.S. § 15A-975(a) (2023) (emphasis added). Subsections (b) and (c) provide a defendant may file a motion to suppress evidence during a trial only if:

> (b) . . . the State has failed to notify the defendant's counsel or, if he has none, the defendant, sooner than 20 working days before trial, of its intention to use the evidence, and the evidence is:
>
> > (1) Evidence of a statement made by a defendant;
> > (2) Evidence obtained by virtue of a search without a search warrant; or
> > (3) Evidence obtained as a result of search with a search warrant when the defendant was not present at the time of the execution of the search warrant.
>
> (c) If, after a pretrial determination and denial of the

> motion, the judge is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion, he may permit the defendant to renew the motion before the trial or, if not possible because of the time of discovery of alleged new facts, during trial.

N.C.G.S. §§ 15A-975(b), (c) (2023).

Defendant acknowledges he "did not move to suppress his statements to law enforcement at the hospital the day after the incident, as required by N.C.G.S. §15A-975(a), nor do the exceptions of N.C.G.S. §15A[-]975(b) or (c) apply." Thus, this argument is not preserved on appeal and is dismissed. *See State v. Howie*, 153 N.C. App. 801, 802 (2002) ("A motion to suppress made before or during trial is required to properly preserve for appeal an objection to the admissibility of evidence.").

## IV. <u>Conclusion</u>

Upon careful review, we hold the trial court did not err in denying Defendant's motion to dismiss where the State presented substantial evidence of premeditation and deliberation through witness testimony, such that it was for the jury to decide. We dismiss Defendant's second argument regarding rebuttal evidence for lack of preservation where Defendant failed to file a motion to suppress.

NO ERROR

Judges TYSON and HAMPSON concur.

Report per Rule 30(e).